UNITED STATES *v.* BLISS & CO. *et al.* (No. 1558).[1]

Azimuth mirrors, sextants, and octants are dutiable as composed chiefly of metal, under paragraph 167, tariff act of 1913; and, not being aids to vision, are not classifiable as optical instruments under paragraph 93.

United States Court of Customs Appeals, December 6, 1915.

APPEAL from Board of United States General Appraisers, G. A. 7697 (T. D. 35220).

[Affirmed.]

*Bert Hanson,* Assistant Attorney General (*Harry M. Farrell,* special attorney, of counsel), for the United States.

*Walden & Webster* (*Henry J. Webster* of counsel) for appellees.

---

[1] Reported in T. D. 35980 (29 Treas. Dec., 717).

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

BARBER, Judge, delivered the opinion of the court:

The merchandise here consists of three articles, a so-called azimuth mirror, an octant, and a sextant.

This azimuth mirror is, in fact, an apparatus composed chiefly of metal, constructed and designed to be attached to the outer edge of a circular bezel within and below the top portion of which a mariner's compass is contained. The bezel is of conical shape and has degree dimensions indicated upon the inside. Evidently the word "azimuth" is used as part of the name of the apparatus because it means "the angle or arc of the horizon that a vertical plane passing through a heavenly body makes with the meridian of the place of observation" (Century Dictionary).

The azimuth apparatus here supports a glass prism possessing both reflective and refractive properties. The angle of the prism may be adjusted at pleasure and the prism itself is an indispensable part of the apparatus. There are shaded glasses to protect the eyes from the glaring rays of the sun, and a small magnifying glass the function of which does not clearly appear. This apparatus is not a mirror in the ordinary sense of the term, but is called such because similar instruments formerly did have a mirror in them.

After the so-called azimuth mirror has been attached to the compass it is used by revolving it laterally until the prism is at right angles to the rays of the sun or at right angles to the straight line from the appliance to the object it is desired to locate. The prism is then revolved vertically on its own axis to such a position that the light from the sun or other object is deflected by the prism to the periphery of the compass card upon which the image of the sun or other object can then be seen. Upon the compass card are divisions representing degrees, which, in connection with the degree dimensions on the bezel, enable the navigator to ascertain and determine the angular error of the compass.

In other words, this azimuth mirror or instrument is used in connection with a compass for the purpose of checking its readings by comparing the known bearing of some object on land, or the sun, or the North Star with the compass bearing, the difference between the known bearing and the compass bearing being the angular error of the compass. It is made to fit into some particular style or make of compass and can be used only in connection with a compass. It is easily detachable and is sold separately because it often becomes broken or is removed.

While compasses are sometimes used without these instruments, the evidence shows that properly equipped steamships have a standard compass upon which this instrument is mounted. The only witness

called testified that there was no such thing as a correct compass on a modern steamship, and that it was necessary to have some means of checking the compass readings by comparing the same with the known bearing of some other object. In brief, this is the sole function of the so-called azimuth mirror.

The octant and the sextant are practically the same thing, the octant being a cheaper form of sextant, but of identical construction. They are navigation instruments, the object of their use being to measure the angular distance between a celestial body like the sun, moon, star, or planet, and the horizon; this measurement is made on a metal divided scale. The instrument consists primarily of a metallic frame, around one side of which is a curved scale divided into degrees and minutes. An index arm is pivoted at the center, one end of which carries an appliance known as a vernier, which is a means of subdividing the divisions on the main scale. Two small mirrors are attached, reflecting surfaces to the instrument, one fixed rigidly to the frame and known as the horizon mirror, and the other attached to the index arm and known as the index mirror. There are screens of plain colored glass the functions of which are to protect the eyes from the glare of the sun. In each instrument there are, although not essential to use, two small telescopes and one small brass tube. Each of the telescopes has three lenses. Metal is the component material of chief value. There is also a small magnifying reader attached to the index arm to assist the operator to read its registration. There are 17 pieces of glass in the sextant which possess reflective and refractive properties. There are a less number of pieces in the octant, but they are for identically the same purposes. The sextant and the octant are instruments complete in themselves.

The foregoing statements as to the descriptions and uses of all the importations are in part quoted from the evidence, or the board's decision, and in part are obtained from pictures, no samples of the merchandise being before the court. Technically the same may be inaccurate. Assuming they substantially portray the appearance and functions of the merchandise, we proceed to the consideration of the only question in the case, and that is whether or not they are optical instruments as that term is used in paragraph 93 of the the tariff act of 1913, which is hereinafter quoted.

There is no question of commercial designation in the case.

The Board of General Appraisers sustaining the protests held the merchandise dutiable as composed chiefly of metal under paragraph 167 of the same act.

What is or what is not an optical instrument in the common understanding has not been definitely determined by any judicial tribunal so far as we are able to ascertain.

For convenient reference we arrange below in chronological order all the duty paragraphs of tariff acts to which our attention has been called relating to optical instruments:

### 1894.

98. Spectacles, eyeglasses, goggles, opera glasses, and other optical instruments and frames for the same, 40 per centum ad valorem.

### 1897.

108. Spectacles, eyeglasses, and goggles, and frames for the same, or parts thereof, finished or unfinished, * * * (on which a progressive duty upon the per dozen ad valorem value is assessed).

111. Opera and field glasses, telescopes, microscopes, photographic and projecting lenses and optical instruments, and frames or mountings for the same; all the foregoing not specially provided for in this act, 45 per centum ad valorem.

### 1909.

105 is identical with paragraph 108 of the act of 1897.
108 is identical with paragraph 111 of the act of 1897.

### 1913.

91. Spectacles, eyeglasses, and goggles and frames for the same, or parts thereof, finished or unfinished, 35 per centum ad valorem.

93. Opera and field glasses, optical instruments and frames and mountings for the same; all the foregoing not specially provided for in this section, 35 per centum ad valorem.

94. Surveying instruments, telescopes, microscopes, photographic and projection lenses, and frames and mountings for the same, 25 per centum ad valorem.

In addition to the foregoing duty provisions, the tariff acts, beginning with that of 1890, have each contained in the free list a provision identical with that of paragraph 494 of the act of 1913, which reads as follows:

494. Glass plates or disks, rough-cut or unwrought, for use in the manufacture of optical instruments, spectacles, and eyeglasses, and suitable only for such use: *Provided, however,* That such disks exceeding eight square inches in diameter may be polished sufficiently to enable the character of the glass to be determined.

Under the act of 1894 the Board of General Appraisers held that stereoscopes composed of wood and glass (presumably, although not stated to be, glass lenses) were optical instruments within the common understanding of the term, and not manufactures of wood in chief value. See G. A. 2953 (T. D. 15853).

In G. A. 2894 (T. D. 15713) miscroscopes, abbe condensers, and iris glasses were held by the board to be optical instruments under paragraph 98 of the act of 1894. There was no further description of the merchandise or discussion of the question contained in the decision.

In G. A. 2978 (T. D. 15954), with no discussion whatever, marine glasses somewhat larger and having higher magnifying power than opera glasses, were held to be optical instruments.

In G. A. 3361 (T. D. 16842) immersion object glasses (the opinion contains no definite description of the merchandise) were held to be optical instruments and not lenses of glass or pebble.

In G. A. 3380 (T. D. 16952) photographic objective lenses were held to be optical instruments. Each consisted of eight lenses of a superior quality of glass arranged so as to give a higher degree of covering capacity on the photographic plate and to secure freedom from astigmatism. They were set in a brass cylinder having a cap at one end and a suitable device at the other to attach it to photographic cameras, and were designed to be used with such cameras.

In. G. A. 3403 (T. D. 16975) graphoscopes composed of triple folding frames of wood, in one section of which were set three glass lenses, two together and the other above them, the center section having a movable rack upon which photographs were placed and then viewed through the lenses, were also held to be optical instruments without discussion.

Field glasses with aluminum frames were held dutiable as optical instruments under paragraph 98 in G. A. 3535 (T. D. 17273), the board remarking that " Congress has characterized opera glasses as optical instruments, and we find that field glasses are optical instruments."

In G. A. 3754 (T. D. 17820) magic lanterns were found by the board to be optical instruments and toys and, upon the assumption that the provision for optical instruments was more specific than the one for toys, were held dutiable under said paragraph 98.

Under the act of 1897 articles composed of pieces of transparent rock salt, mounted in cork frames, two sides of which were covered by thin glass plates with beveled edges, over which molten sealing wax had been applied, were found by the board to be designed and intended solely for the measurements of heat rays in scientific analyses and observations and were held not to be optical instruments, the board remarking that optical instruments were " designed exclusively to deal with rays of light." In the same case a film of mica mounted between two adherent sheets of glass, the whole forming a ray screen, the sole use of which was to modify rays of light, was found to be an optical instrument. In what connection this article was used was not stated. See Abstract 20751 (T. D. 29618).

A photographic camera and plate holder without lenses was held to be a part of an optical instrument under paragraph 111, but no discussion was given to the question. See Abstract 18466 (T. D. 28850).

No other decisions under the act of 1897 and none under the act of 1909 are called to our attention.

It will be noticed that paragraph 98 of the act of 1894 was subdivided into two parts in the act of 1897; one part, paragraph 108, while providing for spectacles, eyeglasses and goggles, and frames for the same, as did paragraph 98, was extended to cover parts thereof; the other, paragraph 111, while providing for opera glasses as in paragraph 98 of the preceding act, increased the enumeration by adding field glasses, microscopes, telescopes, photographic and projection lenses, all of which the board had held to be optical instruments, retained the term " optical instruments," and extended the provision for frames to include mountings for the same. The n. s. p. f. provision was also for the first time employed in that connection. The word " other " was omitted before " optical instruments " in paragraph 111, but we do not think this fact should be taken as any indication that Congress considered the opera glasses referred to in paragraph 111 were other than such instruments, for if opera and field glasses, microscopes, and telescopes are not " optical instruments "·in the common understanding we are unable to ascribe a meaning to that term. The apparent purpose of this subdivision was to provide for a gradation of duties upon such commonly used types of optical instruments as spectacles and eyeglasses, which are, we understand, composed in part of lenses, as well as to make certain that other well-known types thereof should receive their proper classification. The field of operation for the term " optical instruments " does not seem to be exhausted by the specific enumeration of certain individuals of that class which is made in paragraph 111.

It will also be observed that paragraph 108 of the act of 1909 was subdivided into paragraphs 93 and 94 of the act of 1913. In this subdivision we find that paragraph 93 takes the opera and field glasses, the optical instruments and frames and mountings for the same of said paragraph 108 with the n. s. p. f. provision, while paragraph 94 takes the telescopes, microscopes, photographic and projection lenses and frames and mountings for the same of paragraph 108, assesses a lesser rate of duty thereon than that of paragraph 93, and in addition extends the specific enumeration to include surveying instruments and omits the n. s. p. f. provision.

Nothing in this arrangement suggests that the Congress intended in any wise to depart from or restrict the common understanding of the meaning of the words " optical instruments," but rather that it was its purpose to fix a rate of duty at 35 per cent ad valorem upon one class thereof, including the frames therefor or parts thereof, finished or unfinished, and upon another class, not including the finished or unfinished parts thereof, the same rate, while a third class took a lesser rate.

The addition of " surveying instruments " to paragraph 94 is simply an indication that Congress desired to classify such instruments

*with* but not *as* optical instruments, although we do not mean to be understood that some surveying instruments may not be optical instruments.

In this connection it may be observed that the free-list provisions of all the acts since and including 1890 have favored the rough-cut or unwrought glass plates or disks used in the manufacture of optical instruments, spectacles, and eyeglasses and suitable only for such use. Manifestly these provisions have always been for the benefit of lenses used in " optical instruments " with which spectacles and eyeglasses are mentioned and among which in common understanding we think they are clearly included. The long preservation of this paragraph, in which the term " optical instruments " is thus associated with spectacles and eyeglasses, is suggestive, for the purposes of that paragraph at least, that Congress viewed some optical instruments as similar in their function to spectacles and eyeglasses, else why would it have equally favored lenses therefor?

It is said in Ganot's Elementary Treatise on Physics that an " optical instrument " means " any combination of lenses, or of lenses and mirrors," and that such instruments may be divided into three classes, viz:

1. Microscopes, which are designed to obtain a magnified image of any object whose real dimensions are too small to admit of its being seen distinctly by the naked eye.

2. Telescopes, by which very distant objects, whether celestial or terrestrial, may be observed.

3. Instruments designed to project on a screen a magnified or diminished image of any object which can thereby be either depicted or rendered visible to a crowd of spectators; such as the camera lucida, the camera obscura, photographic apparatus, the magic lantern, the solar microscope, the photo-electric microscope, etc. The two former classes yield virtual images, the last, with the exception of the camera lucida, yield real images.

It is not necessary either to adopt or reject this perhaps somewhat technical definition of the term " optical instrument " in its fullest scope, but sufficient to say that in a great many respects at least we think it accords with the common meaning of the term. See March's Thesaurus Dictionary of the English Language and Knight's American Mechanical Dictionary under " optical instrument."

The word " optics " is well enough in substance defined as the science which treats of light and vision, the organs of sight, chromatics, and all that is connected with the phenomena of sight. See Standard and Century dictionaries. " Optical " of course is an adjective which is derived from the same root as " optics," and means relating to the science of optics.

The Standard Dictionary defines an optical instrument as one " designed to act upon light, especially one involving reflection or refraction or polarization." The Government relies much upon this

definition and insists, because the articles here contain prisms that refract or reflect rays of light that they are each and all optical instruments. We doubt if every device containing prisms or mirrors which refract or reflect light rays is an optical instrument.

An instrument is a means, the implement or tool, by which work is done, and is perhaps more correctly applied to implements used for scientific or professional purposes as distinguished from devices or tools used for industrial purposes. (Standard Dictionary.) So the term " optical instruments " is probably more correct here than " optical implements," because optics is a science itself.

We think in the determination of the question at bar some inquiry should be made as to the purpose as well as the use of these imported articles. They are not designed for experimentation or investigation in the vast field of the phenomena of light. They contain appliances, glass prisms principally, that, taking advantage of known properties of light rays, reflect or refract them upon a prepared surface or plate for the sole purpose of measuring certain angles, the measurement of which, being correctly determined, enables a navigator to correct the error of the magnetic needle and determine the accurate location of his vessel at sea. They do not of themselves, nor are they designed to, directly or indirectly, aid vision. Their function is not to produce for optical inspection a picture of the sun or any heavenly or other object, thereby in any sense assisting or increasing the sense of sight, but rather they present to the vision a desired mathematical conclusion which is expressed upon an instrument in degrees by means of light. They apply principles or laws discovered and established by prior investigation in the science of optics for the purpose of producing a result not optical but mathematical, viz, the measurement of an angle.

The fact that light is the foundation of vision is doubtless the reason why the science of optics is said to relate not only to the organs of vision but to light itself and doubtless accounts for what we think is the fact, that in the common understanding of the term " optical " relates to the phenomena of both light and vision. They are inseparable, because light itself is " the sensation of which one becomes conscious through the optic nerve."

The importations here are not " optical instruments " so far as the phenomena of vision is embraced in the meaning of the word " optics "; that is, they do not aid vision, nor are they so intended. They are not such in the other aspect of the meaning of that term except that they take advantage of, apply, and utilize certain long-discovered principles of the phenomena of light, but as we have said, this is solely for the purpose of enabling the true location of ships and other objects to be ascertained and determined by angular measurements. We seriously doubt if they are such instruments as Con-

gress meant to include in the term " optical instruments " as contained in the paragraph under consideration, and give the importers the benefit of the doubt.

The judgment of the Board of General Appraisers is *affirmed.*