UNITED STATES *v.* ARTHUR H. THOMAS CO. (No. 3723)[1]

United States Court of Customs and Patent Appeals, May 21, 1934

*Charles D. Lawrence,* Assistant Attorney General (*Hugo P. Geisler* and *Ralph Folks,* special attorneys, of counsel), for the United States.

*Tompkins & Tompkins* (*J. Stuart Tompkins,* of counsel) for appellee.

[1] T. D. 47105.

[Oral argument April 9, 1934, by Mr. Folks and Mr. Tompkins]

Before GRAHAM, Presiding Judge, and BLAND, GARRETT, and LENROOT, Associate Judges [2]

BLAND, Judge, delivered the opinion of the court:

This is an appeal by the United States from the judgment of the United States Customs Court, First Division, sustaining the importer's protest, and holding that certain merchandise, invoiced as a "Type A microphotometer" was dutiable at 40 per centum ad valorem as scientific instruments under paragraph 360, Tariff Act of 1930. The merchandise was classified and assessed for duty by the collector at 60 per centum ad valorem under the provisions of paragraph 228 (a), of the same act, as an "optical measuring instrument", which assessment was made in conformity with the statements made in the appraiser's "answer to protest" which reads as follows:

The merchandise, subject of protest, consists of a Moll recording microphotometer which "is intended for the investigation of photographed spectra—it resolves the finest details of the negative and assures a high accuracy in measuring line distances." The instrument requires for its functioning certain indispensable optical parts that enable it to measure the density of spectrograms. The instrument was therefore returned for duty as an optical measuring instrument under the provisions of paragraph 228 (a). Note T.D. 44663 Dept.

The protest of the importer claimed the merchandise to be dutiable at 27½ per centum ad valorem under paragraph 372 as machines; at 40 per centum under paragraph 360 as scientific instruments; at 35 per centum under paragraph 353, the electrical-device paragraph; or at 45 per centum under paragraph 228 (b). In this court the importer relies upon its protest claim that the imported merchandise consists of scientific instruments and that they are dutiable under paragraph 360 of said act as found by the trial court.

In view of our conclusions we regard it as necessary to quote only three of said tariff provisions which are as follows:

PAR. 228. (a). Spectrographs, spectrometers, spectroscopes, refractometers, saccharimeters, colorimeters, prism-binoculars, cathetometers, interferometers, haemacytometers, polarimeters, polariscopes, photometers, ophthalmoscopes, slit lamps, corneal microscopes, optical measuring or optical testing instruments, testing or recording instruments for ophthalmological purposes, frames and mountings therefor, and parts of any of the foregoing; all the foregoing, finished or unfinished, 60 per centum ad valorem.

(b) Azimuth mirrors, parabolic or mangin mirrors for searchlight reflectors, mirrors for optical, dental, or surgical purposes, photographic or projection lenses, sextants, octants, opera or field glasses (not prism binoculars), telescopes, microscopes, all optical instruments, frames and mountings therefor, and parts of any of the foregoing; all the foregoing, finished or unfinished, not specially provided for, 45 per centum ad valorem.

PAR. 360. Scientific and laboratory instruments, apparatus, utensils, appliances (including surveying and mathematical instruments), and parts thereof, wholly or in chief value of metal, and not plated with gold, silver, or platinum,.

---

[2] HATFIELD, J., did not participate in this case.

finished or unfinished, not specially provided for, 40 per centum ad valorem; drawing instruments, and parts thereof, wholly or in chief value of metal, 45 per centum ad valorem:  *  *  *

The type A microphotometer at bar records on a photographic film all the lines and the finest details which have been previously recorded on a spectrogram and makes visible details there recorded which would not otherwise show. The result obtained is accomplished by "a beam of light from an incandescent light passing through the plate on the spectrum." Certain lenses styled "objectives" concentrate the light, after it passes through the negative, onto a vacuum thermocouple, which is designated as the essential feature of the instrument. The thermocouple acts only in response to heat rays and the heat rays come from the incandescent light aforesaid. The current in the thermocouple is varied as the heat rays strike the lines of the spectrum on the plate. A galvanometer connected with the thermocouple, and a drum camera complete the operation.

The record shows that the importing company sold the imported articles to the Naval Research Laboratory, the Bureau of Standards, the Carnegie Institution of Washington, Bell Telephone Laboratories, University of Pennsylvania, and to Mead Johnson & Co., located at Evansville, Ind. Except as is herein indicated, the record does not show for what purposes any industrial institution used the apparatus. The evidence is clear and positive that this instrument does not operate on the same principle or perform the same function as a photometer, and that it is misnamed, and should be called a "densitometer", inasmuch as it measures the density of lines on the spectrum; that it is unlike a photometer inasmuch as a photometer is an instrument for comparing the intensities of two light sources, by some physical means, and that the instrument at bar performs its function by the utilization of heat rays, although it is stated that such heat rays may come from an electric light. It is shown that this machine may be used "for study of the density of electron diffraction rings, which are made by electrical means, electron impact on a photographic plate. The plate is affected the same as it would be by light, but it is not light—and density distribution on the plate; and you can study it by the use of this device."

We think it is clearly shown from the record that the instrument at bar is not an optical measuring or optical testing instrument. The term "optical" was discussed in *United States* v. *Bliss & Co.*, 6 Ct. Cust. Appls. 433, T.D. 35980. It was there said that "the term 'optical' relates to the phenomena of both light and vision. They are inseparable, because light itself is 'the sensation of which one becomes conscious through the optic nerve'".

In contending for classification of the microphotometer at bar under paragraph 228(a), the Government urges that the decision of this court in *United States* v. *Clay Adams Co., Inc.*, 20 C.C.P.A.

(Customs) 285, T.D. 46078, is pertinent and controlling. There a device which was a combination of a microscope and a projection lens, both of which were provided for in the paragraph, was under consideration. The facts there were not analogous to the facts here.

It is not contended by the Government here nor was it in the court below that this instrument is an optical instrument described by the term "all optical instruments" in subdivision (b) of said paragraph 228, and the collector did not so classify the merchandise. For reasons heretofore assigned, we feel certain that it does not fall within the term "all optical instruments" in subdivision (b).

We next consider the question as to whether or not the merchandise is a scientific instrument, apparatus, utensil or appliance, such as are provided for in said paragraph 360. The Government contends that the merchandise is used for practical purposes in applied science in industrial establishments as distinguished from a use in pure science, and that under this court's holding in the cases of *Conover* v. *United States*, 17 C.C.P.A. (Customs) 324, T.D. 43743, and *United States* v. *Adlanco Industrial Products Corp.*, 21 C.C.P.A. (Customs) 249, T.D. 46778, the microphotometers at bar are not scientific instruments.

In the last two cited cases and in *United States* v. *Stoelting Co.*, 21 C.C.P.A. (Customs) 588, T.D. 46995, this court held that only instruments used in pure science as distinguished from applied science are dutiable under said paragraph 360. In the *Conover* case, *supra*, the instruments had been imported solely for ordinary commercial use. In that case this court held that the importer had failed to show that the instruments were not scientific instruments and said:

* * * We are of opinion, therefore, that the term "scientific", in paragraph 360, was intended by the Congress to be limited, except as otherwise specially provided therein, to instruments, apparatus, utensils, and appliances used in pure, as distinguished from applied, science. This construction does not seem to be controverted by counsel for either party.

In discussing the use to which the imported instruments in that case were put, the court further said:

This court ought not, and will not, infer that these instruments are substantially reliable and therefore practical instruments for commercial purposes from testimony to the effect that they have been used to a limited extent over a short period of time by two oil companies. It may be that they are too small for purely scientific uses and are suitable for commercial uses only. It is possible that seismographs used for purely scientific purposes are too "sensitive" for ordinary commercial uses. However, these are but conjectures, and we must dispose of this case in accordance with the established facts contained in the record. It is conceded that the articles in question are seismographs. A seismograph is a scientific instrument. (Funk & Wagnalls New Standard Dictionary.) Surely, if the involved articles are not to be classified as scientific instruments, it must be shown, at least, that they are not devoted exclusively to matters pertaining to pure science, but are successfully, not experimentally, and substantially used in ordinary commercial pursuits. Were these facts affirmatively shown by the record, we might reach a different conclusion. However, on the record before

us we must hold that appellant has failed to make a case and that the judgment of the court below is correct.

There is no showing in the record at bar of the particular use to which the microphotometers in controversy are put in any industrial institution. The trial court in an exhaustive opinion by Judge Sullivan in the case of *James G. Biddle Co.* v. *United States*, T.D. 46022, the record in which case is incorporated as part of the record here, goes somewhat exhaustively into the testimony, and after quoting liberally from the same, holds that the imported articles are scientific instruments. We find the following in the opinion, however:

The question next arises whether or not it falls within paragraph 360. We need not distinguish between "applied" and "pure" science. In the case at bar we are confined to the concrete facts disclosed by the evidence, and such facts establish:

That the instruments involved are scientific instruments used as stated by the witnesses in studying the spectrogram and in measuring the density of it by means of heat radiation rather than light: * * *

Since the instrument at bar is in chief value of metal and not plated with gold, silver or platinum, it is our view that whether or not it is described in paragraph 360 depends upon its use, and in order that it be provided for under said paragraph its use must be that in pure science as distinguished from applied science. There is nothing about the functions performed by this instrument which would indicate that it was not used in pure science, and what meagre record there is on the subject is to the effect that its use is a use in pure science.

Dr. C. D. Haigis, a research physicist, testified as follows:

Mr. TOMPKINS. Would you regard these instruments as represented by exhibits A and B as essentially either scientific or laboratory instruments, or not?

The WITNESS. I do not consider that such an instrument could be used for any other purpose than in a laboratory of a college or some research laboratory in an industrial organization.

Dr. C. B. Bazzoni, a physicist and professor of physics at the University of Pennsylvania stated, concerning the imported article:

* * * We use it to analyze spectrum lines after they have been recorded on photographic plates.

Also in Dr. Bazzoni's testimony are found the following questions and answers:

Q. Do you know of any use to which instruments like illustrative exhibit A or B could be put other than in scientific or research work?—A. No.

Q. Or is that their only use?—A. They are designed, and, as far as I know, used exclusively for pure scientific investigational purposes.

Outside of detailed description as to the manner of performance of the instrument, the above is all the testimony in the record which throws any substantial light on the question of whether the imported article is used in pure as distinguished from applied science, and upon

this record we are constrained to agree with the conclusion of the court below that the imported article falls within paragraph 360 as "scientific instruments" and should be there classified for duty purposes.

The judgment of the United States Customs Court is *affirmed*.