**CELESTAIRE, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Slip Op. 96–82.**
**Court No. 93–02–00081.**

United States Court of
International Trade.

May 24, 1996.

Law Offices of George R. Tuttle, and George R. Tuttle III, Washington, DC, for Plaintiff.

Frank W. Hunger, Assistant Attorney General; Joseph I. Liebman, Attorney–In–Charge, and Mikki Graves Walser, International Trade Field Office, Civil Division, Dept. Of Justice, Commercial Litigation Branch; Beth C. Brotman, United States Customs Service, of counsel, for Defendant.

## OPINION

## I

## INTRODUCTION

WALLACH, Judge:

Plaintiff, Celestaire, Inc., challenges the classification of marine sextants imported into the United States from the People's Republic of China. The Customs Service classified the product under the Harmonized Tariff Schedule of the United States ("HTSUS") as other "optical navigational instruments [subheading 9014.80.10]" which carries a tariff of 5.6% *ad valorem*.

Celestaire asserts that any optical feature of the sextant is subsidiary to its primary function and that accordingly the product should be classified as "other non-optical navigational instruments [heading 9014.80.50]", and thus free of duty. In the alternative it argues that Customs was bound not to change, without prior notice, its alleged uniform and established practice ("UEP") of classifying sextants as non-optical navigational instruments.

The parties have submitted competing motions for summary judgment. Celestaire's chief argument is that the sextant's optical elements are solely subsidiary, and that consequently it should be classified as a non-optical navigational instrument. Because the Court finds that at least one optical element of the navigational sextants here at issue is not incorporated solely for purposes subsidiary to the purpose of the imported instruments, Celestaire's motion on the classification issue is denied, and the government's motion is granted.

The Government claims the sextants are optical instruments since they incorporate optical elements. Plaintiff claims the optical elements are subsidiary. There is no real question that the sextant is used for navigation, though it has other uses as well. Rather, the central issue here is interpretation of Additional US Note 3 to Chapter 90 which excludes instruments in which optical elements "are solely for viewing a scale or some other subsidiary purpose." The question in this case is whether any of the sextant's optical elements are for something other than a subsidiary purpose.

Based upon its examination of the statute's ambiguous language and its legislative and judicial history the Court has determined that the four part test of whether an optical element is subsidiary found in *Engis Equip. Co. v. United States,* 62 Cust.Ct. 29, 294 F.Supp. 964 (1969), as later modified and expanded, is consistent with the HTSUS. Application of that test, as well as additional

relevant factors, to the uncontroverted facts before this Court demonstrates that at least one optical element (the split-image mirror) of the sextant is not employed in a manner subsidiary to its other components, that at least that mirror is essential to the sextant's purpose, as imported, that the mirror and other optical elements act upon, deal with and route rays of light, and that those optical elements aid human vision.

Celestaire also argues that Customs was bound by its alleged uniform and established practice ("UEP") of classifying sextants as non-optical instruments. Because Plaintiff is limited to arguing the existence of only a *de facto* UEP [1], and because it has failed to submit any evidence sufficient to support that allegation, its claim on that basis must also fail. If a UEP existed, Customs was bound by 19 U.S.C. § 1315(d) (1988) to publish notice in the Federal Register of any change. Since no notice was published if a UEP existed any change in classification would be void. *See,* 19 CFR § 177.10(c)(1).

While the absence of a published ruling is not fatal to Plaintiff's claim of a UEP, the totality of the circumstances surrounding prior classification of the merchandise here at issue are insufficient to establish any *de facto* practice necessary to create a UEP in the absence of publication. Plaintiff's strenuous arguments notwithstanding, it has failed in its burden of proof on this issue and it will not be permitted to conduct discovery after the fact to prove what it should have established before its Motion was filed.

Accordingly, Plaintiff's Motion For Summary Judgment is denied and Defendant's Motion for Summary Judgment is granted.

## A

### JURISDICTION LIES PURSUANT TO 28 U.S.C. § 1581(a)

The Customs Service liquidated the products at issue between June 7, 1991 and July 24, 1992. Celestaire filed a timely protest on September 5, 1991. 19 U.S.C. § 1514(c)(2) (1988). The Customs Service denied the pro-

test on August 11, 1992. Celestaire filed its summons timely on February 4, 1993. 28 U.S.C. § 2636(a) (1988). These jurisdictional prerequisites having been satisfied, this Court has jurisdiction pursuant to 28 U.S.C. § 1581(a) (1988).

## B

### SUMMARY JUDGMENT IS APPROPRIATE BECAUSE THERE IS NO GENUINE ISSUE OF MATERIAL FACT

The Court may grant a motion for summary judgment "if the pleadings ... and admissions on file ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." USCIT R. 56(d). Here, the parties have stipulated to the material facts, and the court finds no genuine material issue of fact has been placed in dispute by the parties.

■ The meaning of tariff terms is a question of law, while their application to a particular product is a question of fact. *E.M. Chem. v. United States,* 9 Fed.Cir. (T) 33, 35, 920 F.2d 910, 912 (1990) (Citations omitted).

■ Pursuant to 28 U.S.C. § 2639(a)(1), the Customs Service classification in this case is entitled to a presumption of correctness of its factual determinations, and the burden of proof that it is not correct lies with Celestaire. As to Customs' legal interpretations, this Court is legally mandated to find the correct result *de novo. Semperit Industrial Products, Inc. v. United States,* 18 CIT ——, 855 F.Supp. at 1292–1299 (1994). The Court "must consider whether the government's classification is correct, both independently and in comparison with the importer's alternative." *Jarvis Clark Co. v. United States,* 2 Fed.Cir. (T) 70, 75, 733 F.2d 873, 878, *reh'g denied,* 2 Fed.Cir. (T) 97, 739 F.2d 628 (1984). *See, generally, Anval Nyby Powder AB v. United States,* SLIP OP. 96–80, 1996 WL 276952 (1996).

1. A UEP may be established based on prior government published rulings. Plaintiff alleges the existence of a de jure UEP, but no published

ruling, as properly defined, exists here. Accordingly, Plaintiff is limited to its proof of a *de facto* UEP based upon past practice.

## II

### MATERIAL FACTS

"A marine sextant is a hand-held instrument for measuring the angle between the lines of sight to two points by bringing into coincidence at the eye of the observer the direct ray from one point, and a double-reflected ray from the other, the measured angel being twice the angle between the reflected surfaces." Nathanial Bowditch, *American Practical Navigator* at 408 (1984) (hereinafter "*Bowditch*").[2]

According to Plaintiff's literature submitted with the sextant provided as an exhibit to the Court, the Astra IIIB Delux "... is a kind of reflection type angular measuring **optical instrument** chiefly used for measuring the altitude of celestial bodies to obtain the position message in navigation." (Emphasis added).

■ The Astra IIIB Delux contains a number of optical elements [3] including a telescopic sight, seven shade glasses of varying intensity designed to protect the eye from glare, an index mirror, and a split image mirror [4]. See, Statements of Material Facts. The parties disagree on the necessity of the telescope and the shade glasses for effective use of the sextant, but counsel for both Celestaire and the Government agree that as imported, the split-image mirror is essential to operation of the Astra IIIB Delux.[5]

As the Government pointed out at oral argument, the split image mirror performs a necessary optical function of which the human eye is incapable. More specifically,

when the sextant is vertical, and the observer is facing directly towards the sun, the sun's reflected image appears at the center of the horizon glass, half on the silvered part, and half on the clear part. The index arm is then moved until the sun appears to be resting exactly on the horizon. *Bowditch, supra* at 413–414.

At the instant the horizon is observed to be tangent to the disk of the sun, the time is noted and numerical measurements are taken from the graduated arc and the micrometer drum of the sextant. The mariner then uses those figures and various charts and tables as part of a series of observations to locate the vessel's position. *Ibid* at 408 *et seq.*

Thus, while the sextant does not actually locate a vessel's position, it allows an observation which provides information necessary for the user to perform calculations. Optical observations and elements are a not inconsequential portion of that process [6].

## III

### DISCUSSION

#### A

### The Astra IIIB Delux Is An Optical Navigational Element Under The Engis Test Propounded By Plaintiff

This is not a case which requires the court to "navigate uncharted waters without the aid of a jurisprudential sextant," *In re Certain Asbestos Cases*, 112 F.R.D. 427, 432

---

**2.** *Bowditch* is the recognized standard text in the field of nautical navigation.

**3.** Optical elements, for the purposes here at issue, are those which act upon, deal with, or route rays of light. *Engis Equip. Co.*, 62 Cust.Ct. at 32, 294 F.Supp. at 967 (1969).

**4.** The split image mirror as referred to by counsel includes both an index mirror, a piece of silvered plate glass mounted on the index arm perpendicular to the plane of the instrument, with the center of the reflecting surface directly over the pivot of the index arm, and the horizon glass, a piece of optical glass silvered on its half nearer the frame. *Bowditch*, supra at 410. In their statements of facts the parties refer to inclusion of a "whole horizon mirror," with the im-

ported sextant. The exemplar provided to the court is labeled "traditional split mirror," and appears to contain just such an item. For purposes of this opinion, there is no distinction between the two since both are necessary optical elements of the sextant serving the same essential purpose.

**5.** Counsel for Celestaire made that concession at oral argument of its Motion for Summary Judgment, stating "I admit that it is essential." The Government adopted that position in its Cross-Motion For Summary Judgment at p. 16.

**6.** Indeed, Plaintiff's counsel was unable, at oral argument, to identify any navigational instrument other than a sextant which might fit under HTSUS 9014.80.10.

(N.D.Tex.1986). Indeed, the law in this area runs through well-charted and travelled seas.

■ Our guiding star in classification is legislative intent. As was noted in *Tex. Apparel Co. v. United States,* 12 CIT 1002, 698 F.Supp. 932 (1988), *aff'd* 883 F.2d 66 (1989), *cert. denied* 493 U.S. 1024, 110 S.Ct. 728, 107 L.Ed.2d 747 (1990):

> It is axiomatic that statutes are to be interpreted so as to carry out the underlying legislative policy and intent. It is also clear that "the starting point for interpreting a statute is the language of the statute itself."

12 CIT at 1005, 698 F.Supp. at 935 (citations omitted).

Accordingly, we begin our voyage with our primary navigational chart the Harmonized Tariff Schedules of The United States, in this case Chapter 90. It provides:

> 9014 Direction finding compasses; other navigational instruments and appliances; parts and accessories thereof:
>
> 9014.80 Other instruments and appliances: [7]
>
> 9014.80 Optical instruments ........
> Other
> 9014.80.50 Other...................

Further guidance is given by Additional U.S. Note 3 to Chapter 90 which states:

> 3. For the purpose of this chapter, the terms *"optical appliances"* and *"optical instruments"* refer only to those appliances and instruments which incorporate one or more optical elements, but do not include any appliances or instruments in which the incorporated optical element or elements are solely for viewing a scale or for some other subsidiary purpose.

■ Unfortunately, the language of Note 3 is ambiguous. Does it mean:

1) that it excludes only instruments with optical elements where they are used for a purpose different from and subsidiary to the chief use of the instrument (in which case the government wins since the optical elements are used to help locate position, and without them, as the government says, the sextant "would be useless"),

2) that it also excludes instruments with optical elements used for a purpose which contributes to the chief use of the sextant, but which is not essential to that chief use (in which case the government wins since the optical elements are used as part of the chief use of the sextant, and again, without them the sextant "would be useless"), or

3) that the term excludes instruments with optical elements where the chief use of the instrument is not optical (in which case the Plaintiff wins if the purpose of the sextant is not optical but navigational)?

■ When statutory language of tariff classification is ambiguous the Court may utilize navigational aids in construing the statute and disclosing legislative intent. *RBW, Inc. v. United States,* 10 CIT 21, 632 F.Supp. 13 (1986), *aff'd,* 5 Fed.Cir. (T) 51, 806 F.2d 249 (Fed.Cir.1986). Such aids include standard canons of statutory construction, *Berns & Koppstein v. United States,* 13 CIT 191, 194, 1989 WL 24498 (1989), legislative ratification of prior judicial construction, Sturm, *Customs Law & Admin.,* § 52.3 (1995), common meanings understood in trade or commerce, *Schott Optical Glass, Inc. v. United States,* 67 CCPA 32, 34, 612 F.2d 1283, 1285 (1979), as well as the Court's own understanding of the terms used, and standard lexicographic and scientific authorities, *Mita Copystar Corp. v. United States,* 17 CIT 374, 378, 1993 WL 179285 (1993).

■ In this case, we have plotted our way through the reefs and shoals of this statutory voyage using as our navigational instruments 1) Additional Note 3's example given of using optics to read a scale, 2) the common meaning of the word subsidiary as found in reference materials, and 3) prior judicial interpretations of the same or similar statutory language. While none of these tools is optically transparent, language does not exist in a vacuum and we can apply

---

**7.** Heading 9014 contains three other first level subheadings. 9014.10 deals with direction finding compasses, 9014.20 with instruments and appliances for aeronautical and space navigation and 9014.90 with parts and accessories. Plaintiff's sextants fall within none of those three.

common sense as well as usage to its interpretation.

*Engis Equip. Co. v. United States,* 62 Cust. Ct. 29, 294 F.Supp. 964 (1969),[8] is a good port of departure for this voyage. *Engis* dealt with classification of optical measuring instruments. The court posited a four-part analysis:

First, the device must function in such manner that employment of its optical features is dominant or primary, as compared to the role of its other components. Second, the device's optical elements must be essential to its operation; that is, to be considered an optical measuring instrument, the device cannot be operated in its intended manner without the optical components. Third, optical measuring instruments must, in performing their intended function of measurement, act upon, deal with, or route rays of light. This interaction between light and such optical elements as lenses, prisms and mirrors normally manifests itself in divergence, convergence, reflection, refraction, polarization, or merely conveyance of light rays. Finally, the optical system of the instrument must aid human vision or create for inspection a picture or image of some object.

62 Cust.Ct. at 32, 294 F.Supp. at 966–967 (citations omitted).

The court agrees with the Government's argument and Plaintiff's concession that the *Engis* criteria have been modified by subsequent legislative enactment. As the Court pointed out in *United States v. Ataka America, Inc.,* 64 CCPA 60, 550 F.2d 33 (1977):

...it is the statute rather than the criteria of *Engis* which governs the classification of an article as an "optical instrument." The *Engis* criteria, though neither controlling nor exhaustive, do provide an appropriate compendium of "optical instrument" characteristics.

64 CCPA at 65, ftnt 4, 550 F.2d at 36, ftnt. 4.

The important modification of *Engis* though, is that mentioned at footnote 5 of *Ataka.* **"[T]he statutory distinction is between 'subsidiary' and 'not subsidiary'."**[9] *Id.* 550 F.2d at 37 n. 5 (Emphasis added). Thus, as pointed out in *Ataka,* the *Engis* criteria, to the extent they provide guidance to our voyage, have had their first standard changed[10] from a requirement that the optical function be dominant or primary to one that it merely be "not subsidiary."

As was noted above, the uncontested facts demonstrate that Plaintiff's sextants contain (among other optical elements) a split image mirror which is essential to use of the device as imported. Without it, the mariner can not make the observations necessary to perform calculations required to fix his or her location at sea. Indeed, without that admittedly essential part, the Plaintiff's sextant and all its accompanying charts would be useless.

---

8. Plaintiff's counsel conceded at oral argument that the first Engis criteria has been modified to the extent that rather than requiring dominance or primacy of an optical element, due to the "not subsidiary" language the law now requires that "... as long as the visual part of the instrument was equal in function with others then it could be an optical instrument."

9. Prior to the statutory modification implemented by Note 3, sextants were classified as nonoptical. See, e.g. *J. Bliss & Co.,* T.D. 35220 (1915); *United States v. Bliss & Co.,* 6 Ct.Cust. Appls. 433 (1915); and *Davies, Turner & Co.,* T.D. 38877 (1921). The general theme of those early cases was that a sextant had as its chief purpose determining the location of the user, that there could only be one chief purpose and that, *q.e.d.,* the instrument was not optical. The distinction carried over into the numerous later optical instrument cases (none of which dealt with sextants), cited by Plaintiff. *See, e.g., Hen-*

*sel, Bruckmann & Lorbacher v. United States,* 20 Cust.Ct. 327 (1948); *Henry Wild Surveying Instrument Supply Co. v. United States,* 32 Cust.Ct. 91 (1954); and *Sumitomo Shoji New York, Inc. v. United States,* 64 Cust Ct. 299 (1970). Although some of those cases predate *Engis,* through them all runs the common thread of the primacy requirement there articulated.

10. The *Ataka* court held that it could conclude broadly that the term optical instruments "encompasses devices which act upon or interact with light, which permit or enhance human vision through the use of one or more optical elements, and ... which utilize the optical properties of the device in something beyond a 'subsidiary' capacity." 64 CCPA at 66; 550 F.2d at 37. That statement, while certainly accurate as far as it goes, seems, especially in light of the statement that they were not "exhaustive," too greatly to narrow the *Engis* criteria which the *Ataka* court found "useful."

Plaintiff's sextant has a number of elements, and Plaintiff argues that its central function is to locate one's position. Based upon the evidence presented to this Court, however, it can not be said that the optical portion, and at the least the split-image mirror, which performs a necessary optical function of which the human eye is incapable, is subsidiary to the other parts of the sextant. *Bowditch* at 408 *et seq* makes it clear that the purpose of a sextant is not to fix a position *per se*, but rather to determine an angle. See also, *United States v. Bliss & Co., supra.* To do so, the user must locate the vortex of the angle, something that only the split image mirror allows the sextant to do. The mirror is, therefore, essential to the sextant's central purpose.

That conclusion is strongly bolstered and Plaintiff's central argument brought into question by the discussion of sextants in Van Nostrand's Scientific Encyclopedia (Seventh Edition):

> Since the sextant is used by navigators for the purpose of measuring the apparent altitude of celestial objects, the opinion is prevalent that it is purely a navigational instrument. *Such is far from the case*, and the instrument is of value to explorers, surveyors, or any person who desires to measure angular distance. The *optical system of the sextant* ... is shown in the accompanying diagram. [There follows an accurate replication of the description of the optics of the Celestaire Astra IIIB Delux as set forth above].

(Emphasis added).

In any case, as the Court noted in *Ataka*, the *Engis* factors above discussed, and even as modified, are "neither controlling nor exhaustive." The *Ataka* court did not suggest additional factors other than Note 3's modification of the primacy test, but an examination of Note 3, case authorities and standard scientific literature suggests certain additional considerations:

1) Does the optical element aid or enhance vision in a manner that is not merely designed to make more easily readable the results produced by an otherwise non-optical instrument? [11]

2) Does the optical element allow the human eye to perform a special function that it would be unable to do unaided? [12]

3) If the merchandise at issue contains more than one optical element, taken as a whole, even if the individual elements are subsidiary, would they in totality perform a not subsidiary function? [13]

When we apply that modified *Engis* test to the facts here before us, we find our course inexorably plotted to the conclusion that Plaintiff's split-image sextants are optical instruments classifiable under HTSUS 9014.80.10. That accuracy of our plotted voyage is rendered even more certain by application of the additional tests above propounded.

Thus we find that, as modified, the applied *Engis* factors shows us:

1) the split-image mirror is a not subsidiary element of the Plaintiff's sextant, as compared to the role of its other components;

2) the split image mirror is essential to the sextant's operation as it is imported and sold. Plaintiff concedes that it can not be operated in its intended manner without that optical element;

3) The split image mirror acts upon and routes rays of light; and

---

**11.** This test is suggested by the example given in Note 3 which effectively defines the viewing of a scale as a subsidiary purpose.

**12.** This test represents a gloss on the fourth requirement of *Engis* that the system must "aid human vision or create for inspection a picture or image of some object." The split image mirror here at issue does both those things, but it does something more; it does not just enhance normal vision, it allows the user to split the image under observation a task which even the keenest human eye is incapable of performing.

**13.** While, as noted above, given the parties' admissions the court need not consider the subsidiary or non-subsidiary nature of those additional elements (telescope and optical shade glass lenses), even if they are presumed for purposes of argument to be individually subsidiary, they may in the aggregate be of enough import so that their absence would render the merchandise practically disfunctional. In such a case they would be effectively non-subsidiary.

4) The optical system of the instrument aids human vision by allowing the user to see the horizon and observed celestial bodies in a manner otherwise physiologically impossible.

The additional tests also support the conclusion that Plaintiff's sextant is an optical instrument:

1) The split-image mirror enhances the user's vision in a manner different from and greater than the simple increase magnification needed to read results from an otherwise unreadable scale;

2) The split image mirror allows the eye, as discussed above, to do that which it could not otherwise physically do; to simultaneously observe two different planes; and

3) Based on the Plaintiff's own literature above set out, and the discussion of sextants in *Bowditch* and *Van Nostrand's,* it is apparent that other optical elements of the Celestaire sextant, (even if the split-image mirror was not concededly non-subsidiary), are so important to the normal usage of the Celestaire sextant as imported, that as a total unit they would also perform a non-subsidiary function.[14]

Accordingly, the optical elements of the Plaintiff's sextant are not subsidiary and thus the Astra IIIB Delux is an optical instrument under the *Engis* test (as modified) propounded by Plaintiff. As a result, Custom's classification of the imported merchandise as optical navigational instruments under HTSUS 9014.80.10 is correct as a matter of law. The result of that conclusion is not changed by Plaintiff's UEP argument.

**B**

**Plaintiff Has Not Submitted Sufficient Evidence**

**To Prove A Uniform Established Practice**

Celestaire also argues that the Government has violated a uniform and established practice ("UEP") of classifying sextants as non-optical instruments. In support of that proposition Celestaire relies upon 19 U.S.C. § 1315(d)[15], and the issuance by Customs of a Treasury Decision, T.D. 66–94 (1966), and a Customs Ruling, 823621 (June 15, 1987) under the TSUS, which classified Plaintiff's sextants as non-optical instruments.

Plaintiff begins its attempt to establish a UEP from an extremely weak position; with the concession that "abstracted Customs Decisions . . . such as T.D. 66–94 . . . have been held not to come within the meaning of a 'published decision' which would establish a uniform and established practice under section 1315(d)." Opening Brief at 33. Still, Plaintiff says, that taken together with Ruling 823621, there is shown "a long established administrative practice" sufficient to establish a UEP.

In response, the Government points out that to establish a *de facto*[16] UEP, there must be proof of numerous liquidations at more than one port, Defendant's Opening Brief at 24, *citing Heraeus–Amersil, Inc. v. United States,* 8 CIT 329, 600 F.Supp. 221 (1984), *aff'd,* 4 Fed.Cir. (T) 95, 795 F.2d 1575 (1986), *cert. denied* 479 U.S. 1064, 107 S.Ct. 949, 93 L.Ed.2d 998 (1987), and *Siemens America, Inc. v. United States,* 2 CIT 136, 1981 WL 2499 (1981), *aff'd* 1 Fed.Cir. (T) 9, 692 F.2d 1382 (1982).

> No administrative ruling resulting in the imposition of a higher rate of duty or charge than the Secretary of the Treasury shall find to have been applicable to imported merchandise under an established and uniform practice shall be effective with respect to articles entered for consumption . . . prior to the expiration of thirty days after the date of publication in the Federal Register of notice of such ruling . . .

---

**14.** While *Celestaire* appears to be technically correct in its argument that the other optical elements are not necessary at all times for the accurate use of the sextant, Opening Brief at p. 30–31, it is also true that the optical filters (or shade glass) are necessary for use of the sextant to shoot the sun as a fixed reference point during daylight hours. *Ibid* at 30–31. Given the mariner's need for accurate positioning at all times and in all weather, and the need to shoot the sun during the long daylight hours of summer, normal nautical usage requires those additional optical elements.

**15.** 19 U.S.C. § 1315(d) states:

**16.** The Government concedes that a *de facto* practice may be established despite the absence of a published ruling or finding by Customs. Government's Opening Brief at 23–24.

In *Siemens,* the Court did indeed state that one basis of its rejection of a *de facto* UEP argument was the limitation of entries to one port. *Ibid* at 3. That same "one-port" limitation was stressed by the Federal Circuit in *Siemens,* 1 Fed.Cir. (T) at 9–10, 692 F.2d at 1383–84.

In *Heraeus–Amersil* [17] the Court of Appeals held that "with adequate proof" an established and uniform practice could be found to exist, 4 Fed.Cir. (T) at 99–100, 795 F.2d at 1581, and that rulings on 300 entries over a ten year period at the only two ports at which the merchandise was imported was sufficient to establish a UEP. *Ibid* at 100, 795 F.2d at 1581–82.

In this case, Celestaire concedes that it has not provided proof of practice at ports other than Seattle, or of any ruling other than those above discussed. It argues, however, that if those rulings are insufficient to establish a UEP, it should be given the opportunity to obtain additional evidence. Plaintiff's Reply at 22.

Discovery has long since closed in this case, and the Government at oral argument declined to stipulate to its reopening. The court does not find grounds under US-CIT R. 56(g) [18] for reopening discovery and accordingly must reject the Plaintiff's argument that summary judgment should be denied and it should be permitted to engage in discovery of whether a *de facto* practice did exist at two or more ports. Plaintiff's Reply at 22. Any such discovery should have been completed prior to the filing of Plaintiff's Motion For Summary Judgment based on the alleged existence of a UEP.

## IV

## CONCLUSION

Based upon the Court's examination under *Jarvis–Clark, supra,* of Celestaire's sextants and of the evidence presented by the Parties, Plaintiff's Motion For Summary Judgment is DENIED and Defendant's Cross–Motion For Summary Judgment is GRANTED.

## JUDGMENT

This case having come before the Court for decision, and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision, it is hereby

ORDERED, ADJUDGED AND DE-CREED that Defendant's motion for summary judgment be, and hereby is, granted; and it is further

ORDERED, ADJUDGED and DE-CREED that the classification of the subject marine sextants by the United States Customs Service under HTSUS 9014.80.10 is affirmed; and it is further

ORDERED, ADJUDGED and DE-CREED that each party shall bear its own costs.

---

**17.** *Hemscheidt Corp. v. United States,* 18 CIT ——, 858 F.Supp. 223 (1994), *aff'd,* 72 F.3d 868 (1995), upon which Plaintiff also relies, is here inapposite, since the parties there agreed there was a prior UEP. 18 CIT at ——, 858 F.Supp. at 225.

**18.** Rule 56(g) requires affidavits from the party opposing the motion establishing reasons it cannot provide proof in opposition. The rule does not contemplate correction of failure of discovery by the moving party, and in any case an extension of discovery is discretionary.