UNITED STATES *v.* AMERICAN MACHINE & METALS, INC. (No. 4340)[1]

[1] C. A. D. 183.

138

United States Court of Customs and Patent Appeals, November 3, 1941

*Charles D. Lawrence*, Acting Assistant Attorney General (*Richard F. Weeks*, special attorney, of counsel), for the United States.

*Tompkins & Tompkins* (*J. Stuart Tompkins*, of counsel) for appellee.

[Oral argument October 10, 1941, by Mr. Weeks and Mr. J. Stuart Tompkins]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

LENROOT, Judge, delivered the opinion of the court:

In January and June, 1938, appellee imported from England certain articles designated on the invoices as "Vicker's Pyramid Hardness Testing Machines," which were classified by the collector at the port of Chicago as optical testing instruments and assessed with duty at 60 per centum ad valorem under the provisions of paragraph 228 (a) of the Tariff Act of 1930.

The importer protested, making several claims, one of which was that the merchandise was dutiable at 20 per centum ad valorem under paragraph 353 of the Tariff Act of 1930, as modified by the Reciprocal Trade Agreement with Switzerland (T. D. 48093), hereinafter referred to as the Swiss Trade Agreement, and the "most-favored-nation" clause of the treaties between the United States and Great Britain of 1815 and 1827; another claim was that the merchandise was dutiable under paragraph 372 of said act, as modified by said Swiss Trade Agreement.

Paragraph 228 (a) of said tariff act reads as follows:

PAR. 228. (a) Spectrographs, spectrometers, spectroscopes, refractometers, saccharimeters, colorimeters, prism-binoculars, cathetometers, interferometers, haemacytometers, polarimeters, polariscopes, photometers, ophthalmoscopes, slit lamps, corneal microscopes, optical measuring or optical testing instruments, testing or recording instruments for ophthalmological purposes, frames and mountings therefor, and parts of any of the foregoing; all the foregoing, finished or unfinished, 60 per centum ad valorem.

Paragraph 353, as originally enacted by Congress, reads:

PAR. 353. All articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy;

electrical telegraph (including printing and typewriting), telephone, signaling, radio, welding, ignition, wiring, therapeutic, and X-ray apparatus, instruments (other than laboratory), and devices; and

articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs;

all the foregoing, and parts thereof, finished or unfinished, wholly or in chief value of metal, and not specially provided for, 35 per centum ad valorem.

The modification of said paragraph, consisting of an addition thereto embodied in the Swiss Trade Agreement, reads as follows:

Testing machines for determining the strength of materials or articles in tension, compression, torsion, or shear, having as an essential feature an electrical element or device, and parts thereof; any of the foregoing, finished or unfinished, wholly or in chief value of metal, and not specially provided for_____ 20% ad val.

Paragraph 372 as originally enacted, insofar as it is here pertinent reads as follows:

PAR. 372. * * * all other machines, finished or unfinished, not specially provided for, 27½ per centum ad valorem * * *.

The modification of said paragraph, consisting of an addition thereto embodied in said trade agreement, reads as follows:

Machines not specially provided for, finished or unfinished, for determining the strength of materials or articles in tension, compression, torsion, or shear_____ 20% ad val.

The only evidence in the case consists of the testimony of two witnesses produced by appellee, a stipulation of fact, one documentary and one physical exhibit. The Government offered no evidence.

The trial court held, only two judges participating, that, assuming that the involved articles are optical instruments, they are more specifically described in paragraphs 353 and 372, as modified by said trade agreement, and are classifiable under said paragraph 353, as modified, at 20 per centum ad valorem.

Judgment was entered accordingly.

Thereafter the Government moved for a rehearing of the case, one of the grounds upon which its motion was based being that, under the decision and judgment of the trial court the duty upon said articles was, by virtue of said trade agreement, reduced more than 50 per centum, which is prohibited by section 350 (a) (2) of the Reciprocal Trade Agreements Act of June 12, 1934 (48 Stat. 943). Said section 350 (a) (2) and section 350 (c) read as follows:

SEC. 350. (a) (2) [The President is authorized] To proclaim such modifications of existing duties and other import restrictions, or such additional import restrictions, or such continuance, and for such minimum periods, of existing customs or excise treatment of any article covered by foreign trade agreements, as are required or appropriate to carry out any foreign trade agreement that the President has entered into hereunder. No proclamation shall be made increasing or decreasing by more than 50 per centum any existing rate of duty or transferring any article between the dutiable and free lists. The proclaimed duties and other import restrictions shall apply to articles the growth, produce, or manufacture of all foreign countries, whether imported directly, or indirectly: Provided, That the President may suspend the application to articles the growth, produce, or manufacture of any country because of its discriminatory treatment of American commerce or because of other acts or policies which in his opinion tend to defeat the purposes set forth in this section; and the proclaimed duties and other import restrictions shall be in effect from and after such time as is specified in the proclamation. The President may at any time terminate any such proclamation in whole or in part.

* * * * * * *

(c) As used in this section, the term "duties and other import restrictions" includes (1) rate and form of import duties and classification of articles, and (2) limitations, prohibitions, charges, and exactions other than duties, imposed on importation or imposed for the regulation of imports.

Judge Brown, who wrote the opinion upon which the judgment was entered, in an opinion denying the motion for rehearing, expressed the view that the modification of paragraph 353, imposing a duty of 20 per centum ad valorem upon the articles embraced therein, should be considered to impose a duty of 30 per centum upon the articles here involved, for the reason that the President was without power to reduce the duty upon optical instruments from 60 per centum to 20 per centum ad valorem. He therefore was of the opinion that, while the motion for rehearing should be denied, the judgment should be corrected by directing the collector to refund one-half of the duties collected instead of two-thirds of such duties, as the judgment in effect provided.

Judge Keefe, the other participating judge, did not agree with Judge Brown on this phase of the question, and in a concurring opinion expressed the view that the involved articles were not optical instruments, and that at no time were they classifiable as such under paragraph 228 (a), but that, both before and after the effective date of the Swiss Trade Agreement, such articles were classifiable under paragraph 353, and that the effect of the trade agreement modification was merely to reduce the duty upon articles such as are here involved from 35 per centum to 20 per centum ad valorem, which reduction was within the President's power under said Reciprocal Trade Agreements Act. He therefore joined with Judge Brown in denying the motion for a rehearing, and the judgment as entered stands as the judgment of the trial court in the case.

Thereafter, from the judgment so entered, the Government took this appeal.

There is no issue before us as to the applicability of the most-favored-nation clause of said treaties between the United States and Great Britain, or of the generalization clause of the said Reciprocal Trade Agreements Act, and it is conceded that if articles such as are here involved, imported from Switzerland, are subject to the reduced duties provided in said Swiss Trade Agreement, the involved importations from England are entitled to such reduction.

It is established by the evidence that the involved articles are designed for and used in industry to determine the hardness of metals, and that, this having been determined, the compression and tensile strength of the metals can be interpreted.

Each article is composed mainly of base metals, is 4 feet 2 inches high, 2 feet 4 inches long, 2 feet wide, and weighs approximately 520 pounds. The evidence is very vague and unsatisfactory as to the internal mechanism of the article, but the functions performed by the article are stated by both of the witnesses. It employs a commercial diamond indenter of a definite shape, which is pressed into the metal to be tested at a predetermined load and at a predetermined rate of

loading. This is accomplished through the operation of the mechanism of the article, set in motion by machine or foot power. The impression in the metal left by this operation is then measured by means of a microscope permanently attached to the article, and through such measurement and the record of the predetermined load and rate of loading, calculations are made through which the hardness of the metal is determined. The article has two low-voltage bulbs for the illumination of the metal to be tested, an electric buzzer which signals if the loading is not complete, and an electric transformer to supply low-voltage current.

With respect to the use of the microscope upon the article, while there is some testimony that a microscope is not necessary and that a magnifying glass might be used to ascertain the measurement of the indented surface of the metal, the testimony establishes that the article is a precision instrument or machine, and that very great accuracy in measuring the indentation in the metal is necessary. Appellee's witness Phil C. Huntly testified upon this point as follows:

X Q. Is it your understanding that a microscope was attached to and accompanied the importation of every one of these machines?—A. Right.

X Q. The primary and sole object of using this machine is to determine the compression, tensile strength, and hardness of materials or metals; is that correct?—A. The primary one is hardness, from which we can interpret accurately the compression and tensile strength.

X Q. But the function of the machine is to determine and test the hardness of metal?—A. Right.

X Q. In other words, to determine that, it employs Exhibit 2, which is an indenter?—A. Yes.

X Q. If I understood correctly, this indenter is caused to press down on the metal?—A. Yes, sir.

X Q. Is there a registering or a recording of the amount of pressure?—A. There is.

X Q. And that discloses the hardness of metal?—A. Right.

X Q. How is the microscope used on this instrument?—A. When the indenter is pressed into the metal with a predetermined load and predetermined length of time, then this indenter is used—the microscope is used to read the width of the impression or indented surface.

X Q. And it is important to know the width of the indented surface to determine accurately the hardness of the metal?—A. Yes.

X Q. After all, that is what the instrument is for? To determine accurately?—A. Yes; it is a precision instrument.

X Q. Now, in determining with accuracy the hardness of the metal, it is necessary for someone to look into the microscope, isn't it?—A. Yes; it is.

X Q. And when they look in they see the length of the indentation?—A. Right.

X Q. And is that measured?—A. Right. I don't know whether it is shown on that Exhibit 1 or not; I can't see it; but it measures the width of the impression.

X Q. These numbers right up here, does the microscope measure that?—A. Yes.

X Q. And you cannot determine the hardness of metal with accuracy without the use of the microscope?—A. That microscope or some other.

Mr. Weil. That is all. Thank you very much.

Redirect examination by Mr. TOMPKINS.

R Q. Can you also use a high-powered magnifying glass for the same purpose?—A. A high-powered magnifying glass, if it had as high power as the microscope, yes, but it might not be quite as accurate as the microscope.

It is evident from the foregoing that there is some kind of a scale upon the article, furnishing a reading for the microscope so that the measurement of the indentation may be recorded by the operator in terms of numbers.

The first question to be determined is whether the involved articles are "optical measuring or optical testing instruments" within the meaning of paragraph 228 (a). If this question be answered in the affirmative, the question of the application of the modification of paragraphs 353 and 372 by the Swiss Trade Agreement, in relation with paragraph 228 (a), must be considered.

While the decision upon which the judgment appealed from is based assumes that the involved articles are "optical measuring or optical testing instruments," it is appellee's contention (1) that the articles are not instruments at all but are machines and therefore are not within the purview of paragraph 228 (a); (2) that if it should be held that the articles are instruments, they are not "optical measuring or optical testing instruments."

In view of our conclusion upon this branch of the case we may assume, for the purposes of this case, that the articles in question are instruments; but, for the reasons hereinafter stated, we are satisfied that they are not "optical measuring or optical testing instruments" within the meaning of these words as used in paragraph 228(a).

We are in agreement with appellant that a microscope is an optical instrument, and that a microscope is essential to the practical use of the articles here involved; but we cannot agree with appellant that all articles having as an essential feature a microscope or other optical device are optical instruments.

We think it is a matter of common knowledge that implements of war such as heavy guns, bombing planes, etc., are equipped with various optical instruments for measuring distances, angles, etc., without which accuracy of fire would be impossible, but it would never occur to anyone that such implements of war should be regarded as optical measuring instruments.

So, while the articles here involved each contains a microscope which is used to measure an indentation made by the articles, such measurement is not the dominant or primary function for which the article is designed. The microscope is used to measure an indentation upon the metal made *by the article itself*, at a predetermined load.

With respect to the manner in which the results of the operation of the article are secured, appellant's brief states:

1. The primary purpose of the instrument involved is to determine the hardness of metals (R. 20). On the basis of the measurement of the indentation which is accurately made by the microscope, and taking into consideration the load applied in making the indentation, the hardness of the metal is directly computed according to a mathematical formula. The result thus obtained is a certain "Brinell number" which relates solely to its hardness. With a knowledge of the "Brinell number" of a particular piece of steel and the result of previous independent tests made with respect to another piece of steel manufactured under the same conditions and of the same materials it is possible to estimate, subject to a considerable range of error, the tensile strength of such steel. * * *

We think the foregoing quotation, as to the factors involved in making the test, is fairly supported by the evidence in the case.

It therefore appears that, while an optical measurement is essential in the practical use of the article, that is only one of the essential elements. The article not only creates the indentation to be measured, but, to render the optical measurement of any value, the factors of the amount of load and rate of loading must be considered and weighed, and the making of the indentation and the loading and rate of loading are accomplished without the use of any optical instrument. Without the indentation in the metal and the recording of the predetermined load and rate of loading, the miscroscope would be useless as a measuring instrument. In our opinion an article cannot be classified as an optical measuring or optical testing instrument unless the dominant or primary use of the article lies in the employment of its optical features. Therefore, since it cannot be said that the dominant or primary use of the article here involved lies in the employment of the microscope, we hold that such article is not an optical measuring or optical testing instrument classifiable under paragraph 228 (a).

In the Summary of Tariff Information 1929, p. 552, under the heading "Optical Instruments," is found the following:

Description and uses.—Optical instruments are primarily used to aid or supplement human vision; they also include apparatus which depends for its operation on the passage of light through prismatic or lenticular optical glass. Lenses and prisms are the fundamental parts of optical instruments.

We find nothing in the decisions of this or other courts contrary to the last-above-quoted statement.

If the indentation of the metal were accomplished by a separate machine and the article before us consisted only of a microscope and scale for measuring the indentation made by such other machine, we would not hesitate to hold that the article is an optical measuring instrument, classifiable under paragraph 228 (a); but, as hereinbefore shown, such is not the case. Neither, in our opinion, is the involved article *ejusdem generis* with any of the articles specifically named in paragraph 228 (a).

According to dictionary definitions, all of the articles *eo nomine* specified in paragraph 228 (a) have primarily to do with light or vision, or both.

As stated in appellant's reply brief:

> There seems to be no common denominator for all these instruments. Some of them separate, some of them magnify, some of them aid vision, some of them are mirror-like, and some of them measure. * * *

However, none of the instruments *eo nomine* specified in paragraph 228 (a) is an article the major portion of which is designed for the performance of functions entirely distinct from those having to do with light or vision, or in other words, for the performance of non-optical functions.

We are impressed with the suggestion of appellee that if, in the enactment of paragraph 228 (a), Congress had intended its terms to apply to all articles having a microscope attached thereto, which microscope, although a minor part of the article, is essential to the proper functioning of such article, language could have been added to the paragraph as follows: "and all articles having as an essential feature an optical element or device, such as microscopes," etc., as Congress did in the enactment of paragraph 353 relating to electrical articles. However, Congress did not see fit to add such language to paragraph 228 (a).

In support of its contention that the involved articles are optical measuring or optical testing instruments, the Government relies largely upon our decision in the case of *Ferner, etc.* v. *United States,* 23 C. C. P. A. (Customs) 62, T. D. 47735, and a decision of the United States Customs Court in the case of *Tinius Olsen Testing Machine Co.* v. *United States,* T. D. 49303, 72 Treas. Dec. 761.

The case of *Ferner, etc.* v. *United States, supra,* is readily distinguishable from the case at bar. In that case the articles involved were spectrographic comparators and "universal measuring machines." Both kinds of instruments were purely measuring devices in which a microscope or several microscopes were integral and essential features of the devices. In our opinion we stated:

> Regardless of the scope intended by the term "optical measuring * * * instruments" and without indicating a precise definition of that term, and without suggesting everything which Congress might have contemplated would be provided for thereby, we feel certain that one of the instruments it intended to include therein was an instrument by which measurements were made, such as those involved in the consideration of the instant appeal, wherein optical devices and optical principles are involved and essential in making such measurements. That a microscope is an optical instrument is not disputed, and that an optical function is performed by the use of optical instruments when the devices at bar are used cannot be seriously questioned. Therefore, in view of the legislative history and the context of the paragraph under consideration and related paragraphs, we.are of the opinion that the term "optical measuring * * * instru-

ments" in paragraph 228 (a) was intended to embrace instruments of the character of the ones represented by the exhibits at bar.

As hereinbefore stated, if the articles here under consideration involved only measuring by means of a microscope, as in the *Ferner* case, *supra*, or testing by means of a microscope, we should conclude that the articles are optical measuring or optical testing instruments; but the measuring constitutes only one function of the involved articles, although an essential function, and the other important functions of the articles do not involve any optical function.

There is nothing in the *Ferner* case, *supra*, indicating that every testing instrument having as an essential element thereof a microscope which measures something in the course of the test is an optical measuring or optical testing instrument.

With respect to the case of *Tinius Olsen Co.* v. *United States, supra,* we would first observe that the article there involved was similar to the articles here under consideration, and it was held by the Customs Court to be classifiable under paragraph 228 (a) as an optical measuring or optical testing instrument. In arriving at that decision the court relied upon our decision in the case of *Ferner, etc.* v. *United States, supra,* but ignored the marked differences between the article under consideration by it and the articles involved in the *Ferner* case.

In its decision the Customs Court stated:

\* \* \* The facts in the case at bar confine this instrument to one purpose, namely, optically measuring or testing.

The court ignored the fact that there was no optical function performed in making the indentation in the metal to be tested, or in determining the amount or rate of loading in making the indentation.

We are convinced that the articles before us are neither optical measuring nor optical testing instruments. While they are used to test metals, and a measurement by means of an optical instrument furnishes one of the factors in making the test, such measurement is only one of the factors, the other functions of the machine being so important that the microscope would be utterly valueless for any purpose were they absent.

Holding as we do that the involved articles are not within the purview of paragraph 228 (a), it is unnecessary for us to consider the reasoning by which the trial court came to the conclusion that they are classifiable under paragraph 353, as modified by the Swiss Trade Agreement, because more specifically described in said paragraph 353 than in paragraph 228 (a).

Appellant contends that the articles are not classifiable under paragraph 353 as modified by the Swiss Trade Agreement for the reason that, as it contends, (1) they are not machines "for determining the strength of materials or articles in tension, compression, torsion or shear," as provided in the modification of paragraphs 353 and 372

by the Swiss Trade Agreement, and (2) that they are not classifiable under paragraph 353 for the reason that they have no electrical elements or devices as an essential feature.

Upon the point first above set out, while it is true that the articles are primarily designed to test the hardness of metals, appellant admits and the evidence shows that from the hardness of the metal its compression and tensile strength can be determined. We therefore are of the opinion that appellant's contention upon this point is without merit.

Upon the second point above stated, whether or not the involved articles have as an essential element an electrical element or device, we are of the opinion that it is unnecessary to determine this question for the reason that, if the article is not classifiable under paragraph 353 as modified at 20 per centum ad valorem, it is classifiable under paragraph 372, as modified by the Swiss Trade Agreement, at the same rate, viz, 20 per centum ad valorem.

The Government makes no contention that the involved article is not in fact a machine, and it is clear that, if it is not classifiable under either 228 (a) or paragraph 353, it is classifiable under paragraph 372 as modified by the Swiss Trade Agreement.

Inasmuch as it is immaterial to appellant or appellee whether the article be classified under paragraph 353 as modified or under paragraph 372 as modified, since the duty collectible is the same in either case, we prefer not to pass upon the dutiability of the article under paragraph 353 for the reason that, in order to determine definitely that question, consideration should be given to a point not argued by either side in this case. That point is whether the addition to paragraph 353 made by the Swiss Trade Agreement should be regarded as merely carving out from paragraph 353 as originally enacted certain articles that were classifiable thereunder in order to admit them at a lower rate of duty, or whether said addition to paragraph 353 should be considered to invade other paragraphs of said tariff act, so long as the decrease in duties by such addition is not greater than 50 per centum.

If it should be held that it was the intention of the Swiss Trade Agreement merely to carve out from paragraph 353 certain articles that were classifiable under the paragraph as originally enacted, in order to admit them at a lower rate of duty, then the question would arise as to whether the involved articles, if it should be held that they have as an essential feature an electrical element or device, are *ejusdem generis* with the articles named in the third provision of paragraph 353. See *John A. Steer & Co.* v. *United States*, 24 C. C. P. A. (Customs) 293, T. D. 48737. This is a question which should be fully argued if the occasion should arise.

In view of the foregoing we shall not decide the question of which of the two paragraphs, paragraph 353 as modified or paragraph 372 as

148

modified, is the proper paragraph under which the involved articles are classifiable, inasmuch as the proper rate of duty is the same in either case.

Precedent for this course is found in a decision of this court in the case of *United States* v. *Hartwig*, 2 Ct. Cust. Appls. 267, T. D. 31976, which involved the proper classification of certain furs. The Board of General Appraisers (now the United States Customs Court) had classified the furs by similitude under the first clause of paragraph 439 of the tariff act of 1909. In affirming the decision of the board the court stated:

> No provision having been made in the tariff act of August 5, 1909, for manufactures of furs in general, it would seem that the merchandise in question should be assessed for duty either under paragraph 480 or under the first clause of paragraph 439, by virtue of the provisions of paragraph 481. Under which of these provisions the importation should be assessed for duty it is unnecessary to decide in this case. Whether the merchandise be held to be dutiable under the first clause of paragraph 439 by similitude to furs dressed on the skin not further advanced than dyeing but not repaired, or under paragraph 480 as a nonenumerated manufactured article, the rate of duty would be 20 per cent ad valorem, which was the rate fixed by the board.

Also, in the case of *United States* v. *Buffalo Natural Gas Fuel Co.*, 172 U. S. 339, it was held that where the merchandise in suit was free of duty under one paragraph or another, it was unnecessary to decide which of those two paragraphs controlled its classification.

We think the judgment appealed from is valid since it names the proper rate of duty. Therefore it is sufficient for us to hold, and we do hold, that the judgment appealed from, insofar as it adjudges that the involved merchandise is dutiable at 20 per centum ad valorem, should be, and it is, *affirmed.*