**CELESTAIRE, INC., Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant–Appellee.**

No. 97–1005.

United States Court of Appeals, Federal Circuit.

July 29, 1997.

George R. Tuttle III, San Francisco, California, argued for plaintiff–appellant.

Mikki Graves Walser, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, New York City, argued for defendant–appellee. With her on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Washington, DC, and Joseph I. Liebman, Attorney in Charge, International Trade Field Office, New York City. Of counsel on the brief was Beth C. Brotman, Office of Assistant Chief Counsel, International Trade Litigation, U.S. Customs Service, New York City.

Before MICHEL, PLAGER, and CLEVENGER, Circuit Judges.

MICHEL, Circuit Judge.

Celestaire, Inc. ("Celestaire") appeals the order of the United States Court of International Trade granting summary judgment to the United States in Celestaire's challenge of the Customs Service's classification of imported marine sextants as "optical navigational instruments" (Harmonized Tariff Schedules of the United States ("HTSUS") subheading 9014.80.10), dutiable at 5.6% ad valorem, rather than as "other non-optical navigational instruments" (HTSUS subheading 9014.80.50), which are not subject to a tariff. CIT No. 93–02–00081. This appeal was submitted for our decision following oral argument on May 7, 1997. Because we hold that (1) sextants permit, aid or enhance human vision; (2) split-image mirrors are non-subsidiary optical elements in sextants; and (3) the appeal is not controlled by *United States v. Bliss & Co.*, 6 Ct. Cust.App. 433 (1915), which concluded that under then-extant Customs law sextants were metal articles, not optical instruments, we affirm.

## BACKGROUND

Celestaire imports from China the Astra IIIB Delux, a marine sextant. "A marine

sextant is a hand-held instrument for measuring the angle between the lines of sight to two points by bringing into coincidence at the eye of the observer the direct ray from one point, and a double-reflected ray from the other, the measured angle being twice the angle between the reflected surfaces." Nathaniel Bowditch, *American Practical Navigator* 408 (1984).

When the sextant is vertical, and the observer is facing directly towards the sun (or other celestial body), the sun's reflected image appears at the center of a split-image mirror, half on the silvered part, half on the clear part. The index arm is then moved until the sun appears to be resting exactly on the horizon. At the instant the horizon is observed to be tangent to the disk of the sun, the time is noted and numerical values are read from the graduated arc and the micrometer drum of the sextant. The mariner then uses those figures, consulting various charts and tables, and making a series of observations, to locate his or her vessel's position.

The HTSUS contain the following classification structure:

9014   Direction finding compasses; *other navigational instruments* and appliances; parts and accessories thereof:

9014.80   Other instruments and appliances:

9014.80.10   *Optical instruments* . . . .

Other

9014.80.50 *Other* . . . .

(emphasis added).

Additional U.S. Note 3 to Chapter 90 states:

For the purpose of this chapter, the terms *"optical appliances"* and *"optical instruments"* refer only to those appliances and instruments which incorporate one or more optical elements, but do not include any appliances or instruments in which the incorporated optical element or elements are solely for viewing a scale or for some other subsidiary purpose.

(emphasis in original).

## DISCUSSION

Pursuant to the HTSUS, an instrument must contain optical elements to be classified as an "optical instrument." Optical elements are defined as elements which act upon, deal with, or route rays of light, *see Engis Equip. Co. v. United States,* 62 Cust.Ct. 29, 294 F.Supp. 964, 967 (1969), in a way that permits or enhances human vision, *see United States v. Ataka Am., Inc.,* 64 C.C.P.A. 60, 550 F.2d 33, 37 (1977). Celestaire concedes that a sextant contains at least one optical element, the split-image mirror, and that the mirror is essential to the sextant's operation. However, it disputes that the sextant's purpose is to aid human vision and argues that the mirror is merely subsidiary. Celestaire also argues that we are bound by stare decisis to follow the decision in *Bliss,* which held that sextants do not have as their purpose to aid vision and are therefore not optical instruments under the Tariff Act of 1913. We reject these arguments, which we treat in turn.

I. In determining whether the sextant is an optical instrument, we must apply the criteria set forth in *Ataka* by the Court of Customs and Patent Appeals, whose decisions are to us binding precedent:

1) whether the device acts on or interacts with light;

2) whether the device permits or enhances human vision through the use of one or more optical elements; and

3) whether the device uses the optical properties of the device in something more than a "subsidiary" capacity.

*See* 550 F.2d at 37.

As for the first *Ataka* criterion, there is no question that the sextant interacts with light, because it routes rays of light. The success of Celestaire's argument depends, then, on whether the sextant permits or enhances human vision through the use of one or more optical elements, and whether the split-image mirror (a concededly optical element essential to the functioning of the sextant) is used in a non-subsidiary capacity. We hold that the sextant does and the mirror is so used.

The sextant aids and enhances human vision through its use of the split-image mirror. The split-image mirror permits a sextant user to see in the same plane two

objects (the sun or other celestial body and the horizon) which actually exist in different planes. The human eye cannot do this without such optics. By providing this capability, the sextant allows the user to measure the angle between a celestial body and the horizon more accurately than could be done with the naked eye. That the end goal of sextant use—the determination of navigational position—is not visual, cannot change the physiological fact that to make the necessary measurement of the angle between the sun and the horizon, simultaneous human vision of objects in different planes must first be, and is, permitted by the mirror.

As to whether the optics are used in a subsidiary capacity, the rationale in *Ataka* provides useful guidance. In that case, a fiberscope was held to have non-subsidiary optics because the "predominant use" of the fiberscope was to permit viewing of the inside of the human body, even if the ultimate use was to perform biopsies and cytological studies. The court stated:

> To term optical features merely subsidiary to biopsy-cytology features, when the latter *require* the former, and when the latter are not always used and the former are always used, would be contrary to reason.

*Id.* at 38 (emphasis in original). This rationale applies similarly here. The split-image mirror must always be used to measure the angle and to determine navigational position. Because it is concededly essential to the functioning of the sextant, it is disingenuous to characterize the split-image mirror as used only in a "subsidiary capacity." The predominate use of the sextant is to sight the angle between the sun and the horizon even if the ultimate use is to locate position as an aid to navigation.

Our conclusion that the sextant enhances human vision through the use of its non-subsidiary optical element is also consistent with the analysis in *Engis,* 294 F.Supp. 964. There, the Court of International Trade, then called the Customs Court, held that an autocollimator, "an instrument which is used to determine the flatness or straightness of a surface by obtaining angular measurements that are then converted into linear values,"

*Engis,* 294 F.Supp. at 965–66, made non-subsidiary uses of its optical elements. The court further held that the instrument as a whole aided human vision because, although the human eye can, to some degree, determine the flatness or straightness of a surface, the autocollimator can do so more accurately. *Id.* at 969. The court noted: "[A] device, such as an autocollimator, that assists the normal visual process in making angular determinations is unquestionably an aid to vision." *Id.* Here, as noted above, the sextant aids the vision of the user by more accurately measuring angles than he or she otherwise could.

As a further aid in determining whether the split-image mirror is "subsidiary," the context of Note 3 is helpful. Immediately before the "subsidiary purpose" language in the Note, the Note states that "instruments in which the incorporated optical element or elements are solely for viewing a scale" are not optical instruments. Here, clearly, the split-image mirror is not "solely for viewing a scale." Nor is it for any purpose that is of similar last step and low import as scale viewing. Rather, the function of the split-image mirror, to allow objects in two planes to be viewed simultaneously, is the first and most critical step in being able to determine the angular measurement and, ultimately, navigational position.

Celestaire attempts to avoid the conclusion that the use of the split-image mirror is non-subsidiary by relying on two decisions, *EAC Eng'g v. United States,* 623 F.Supp. 1255 (Ct. Int'l Trade 1985), and *Sumitomo Shoji New York, Inc. v. United States,* 64 Cust.Ct. 299 (1970), where uses of optical elements critical to the functioning of the devices were nonetheless held to be subsidiary.

These cases, however, are distinguishable. In *EAC Engineering,* the court held that spark detectors are non-optical because they detect only infrared radiation (invisible to the human eye) and therefore do not aid human vision. 623 F.Supp. at 1260. Similarly, in *Sumitomo,* the court held that a parabolic mirror was not optical because it did not aid human vision, but rather reflected light not toward human eyes, but into a light detector. 64 Cust.Ct. at 301.

II. Celestaire's final argument is that *Bliss* controls the result in this case. In *Bliss,* the Court of Customs Appeals[1] held that sextants are dutiable as articles composed chiefly of metal, under Schedule C, paragraph 167 of the Tariff Act of 1913, 38 Stat. 130 (1913), rather than as optical instruments under Schedule B, paragraph 93, 38 Stat. 122. In holding that sextants were not optical instruments, the court reasoned that the purpose of sextants was not to aid or enhance vision, but rather to measure angles in order to determine the location of a vessel at sea. 6 Ct. Cust.App. at 440. We hold that *Bliss* does not control the outcome of this appeal for two reasons: first, the test for whether an instrument is optical under *Ataka* is different from the test used in *Bliss,* and *Ataka* is binding on us; second, the court in *Bliss* was interpreting an entirely different tariff schedule, with far different categories applicable to optical instruments, and was deciding a different question than that presented here.

As to the first point, *Ataka,* in contrast to *Bliss,* looks to the immediate, rather than ultimate purpose of the device. As discussed above, the immediate purpose of the sextant is to allow the user to see the sun and the horizon at the same time—an act which the user could not otherwise do. The intermediate purpose is to accurately measure angles which can only be estimated by the naked eye. It is only the ultimate purpose, to determine navigational position, that does not have to do with enhancing human vision. To the extent that *Ataka* and *Bliss* conflict, *Ataka* controls as the later issued decision because the Court of Customs and Patent Appeals always sat in banc and therefore later decisions overcome earlier inconsistent ones. *See In re Ochiai,* 71 F.3d 1565, 1569 (Fed. Cir.1995).

As to the second point, since *Bliss* was decided in 1915, the tariff schedules have been changed and restructured no less than four times, *see* Tariff Act of 1922; Tariff Act of 1930; Tariff Schedules of the United States; Harmonized Tariff Schedules of the

United States, and these changes have concerned tariff categories for navigational and optical instruments, including sextants. These changes in the tariff structure cast doubt on the present applicability of *Bliss* simply because the court in *Bliss* was interpreting so different a tariff schedule.

Perhaps more importantly for our analysis, however, the court in *Bliss* was deciding whether sextants were properly considered articles of metal under Schedule C (Metals and Manufactures Of), 38 Stat. 123, Paragraph 167, 38 Stat. 130, of the Tariff Act of 1913, or were properly considered "[o]pera and field glasses, [or] optical instruments" under Schedule B (Earths, Earthenware, and Glassware), 38 Stat. 120, Paragraph 93, 38 Stat. 122. Thus, the dissimilarity of sextants with opera glasses was paramount in the court's analysis. Here, the choice is between navigational instruments that are optical and those that are not, such as Loran or Global Positioning Systems, which are electronic, not optical. It is uncontested that sextants are navigational instruments; we are only asked to determine whether they are optical ones or not. Since the court in *Bliss* was asked to make a radically different determination under a completely different statutory scheme, its determination that sextants are articles "composed wholly or in chief value of ... metal," 38 Stat. 130, and therefore not optical instruments, cannot control here.

## CONCLUSION

Because a sextant aids or enhances human vision, overall, and through the use of its non-subsidiary split-image mirror, and because *Bliss* is no longer good law and does not control under the present tariff laws, the decision of the Court of International Trade is

*AFFIRMED.*

---

**1.** In 1929, Congress changed the name of the Court of Customs Appeals to the Court of Customs and Patent Appeals ("CCPA"). *In re Lueders,* 111 F.3d 1569, 1575 (Fed.Cir.1997). This court has adopted the precedent of the CCPA. *South Corp. v. United States,* 690 F.2d 1368, 1369 (Fed.Cir.1982) (in banc).