# United States Court of Appeals for the Federal Circuit

---

**ADC TELECOMMUNICATIONS, INC.,**
*Plaintiff-Appellant*

v.

**UNITED STATES,**
*Defendant-Appellee*

---

2018-1316

---

Appeal from the United States Court of International Trade in No. 1:13-cv-00400-RKM, Senior Judge R. Kenton Musgrave.

---

Decided: February 19, 2019

---

MICHAEL EDWARD ROLL, Pisani & Roll LLP, Los Angeles, CA, argued for plaintiff-appellant. Also represented by BRETT HARRIS, ROBERT J. PISANI, Washington, DC.

GUY EDDON, Commercial Litigation Branch, Civil Division, United States Department of Justice, New York, NY, argued for defendant-appellee. Also represented by AMY RUBIN; JEANNE DAVIDSON, JOSEPH H. HUNT, Washington, DC; BETH C. BROTMAN, Office of the Assistant Chief Counsel, United States Bureau of Customs and Border Protection, United States Department of Homeland Security, New York, NY.

———————————

Before PROST, *Chief Judge,* DYK and WALLACH, *Circuit Judges.*

WALLACH, *Circuit Judge.*

Appellant ADC Telecommunications, Inc. ("ADC") sued Appellee United States ("the Government") in the U.S. Court of International Trade ("CIT"), challenging U.S. Customs and Border Protection's ("Customs") classification of imported Value Added Modules ("VAM") consisting of fiber optic telecommunications network equipment under Harmonized Tariff Schedule of the United States ("HTSUS")[1] Subheading 9013.80.90, which bears a duty rate of 4.5% *ad valorem.* ADC and the Government filed cross-motions for summary judgment, with ADC arguing that the subject merchandise should be classified under HTSUS Subheading 8517.62.00, which bears a duty-free rate. The CIT denied ADC's Cross-Motion, and granted the Government's Cross-Motion, holding that Customs properly classified the subject merchandise under HTSUS Subheading 9013.80.90. *ADC Telecomms., Inc. v. United States*, No. 13-00400, 2017 WL 4708021, at *9 (Ct. Int'l Trade Oct. 18, 2017); *see* J.A. 12 (Judgment).

ADC appeals. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5) (2012). We affirm.

BACKGROUND

The subject merchandise "consists of fiber optic telecommunications network equipment" and "is included in

———————————

[1] "All citations to the HTSUS refer to the 20[12] version, as determined by the date of importation of the merchandise." *LeMans Corp. v. United States*, 660 F.3d 1311, 1314 n.2 (Fed. Cir. 2011); *see* J.A. 1057–58 (providing that the subject merchandise was imported on June 15, 2012).

[ADC's VAMs] product line." *ADC*, 2017 WL 4708021, at *2 (citations omitted).[2] "Fiber optic telecommunications networks operate by pulses of light in the infrared wavelength range, which transmit voice, sound, images, video, e-mail messages, and other information from one point in the network to another." *Id.* (citations omitted). "The wavelength of the light typically used to transmit data in a fiber optic telecommunications network is approximately 1260 nanometers to 1650 nanometers; whereas human eyes can see light only in the wavelength range from about 400 nanometers to 700 nanometers," meaning "humans would not be able to see the light that is used" in the subject merchandise. *Id.* (citations omitted).

The VAM product line "is intended to ease installation of the articles into [ADC]'s telecommunications network operator customers' fiber optic networks" by including "connectors on the ends of the fibers, eliminating the need for telecommunications network providers to splice the fibers into their networks," and protective "housing" or "jacketing over the actual fiber itself" to prevent damage to the optical fibers "either during the installation process or from the environment during use." *Id.* (citations omitted). There are three categories of products in the VAM product line: (1) splitter modules, which "take individual signals from a single optical fiber and divide them, enabling that single signal to reach multiple telecommunication network subscribers," (2) monitor modules, which "allow access to signaling and control functions of a communications network in order to evaluate performance and detect problems," and (3) wavelength division multiplexer ("WDM") modules, which "permit infrared signals of two different wavelengths to travel simultaneously on a single fiber,

---

[2] Because the parties do not dispute the material facts, we cite to the facts as recited by the CIT for ease of reference. *See ADC*, 2017 WL 4708021, at *2–3.

thereby increasing the capacity." *Id.* (citations and footnotes omitted). The subject merchandise "is used primarily or exclusively for purposes of data transmission in a telecommunications network . . . exclusively using light in the infrared wavelength range," and the merchandise does not "contain any electronic components or electrical circuit boards." *Id.* at *3 (citations omitted).

The CIT determined that HTSUS Heading 9013, which covers "other optical appliances and instruments, not specified or included elsewhere in this chapter," is "an apt description of [ADC's] VAMs . . . because such appliances and instruments, used in conjunction with the 'optical fibers' of [HTSUS H]eading 9001 . . . are plainly covered by [C]hapter 90." *Id.* at *6 (internal quotation marks omitted). The CIT explained that HTSUS Heading 8517, which covers "other apparatus for the transmission or reception of voice, images or other data, including apparatus for communication in a wired or wireless network (such as a local or wide area network)," "would appear apt insofar as it describes the sole purpose of the VAMs." *Id.* at *5 (internal quotation marks omitted). However, the CIT concluded that the subject merchandise "are prima facie classifiable" in HTSUS Heading 9013, and because they are included in Chapter 90, they are "therefore excluded from [C]hapter 85 pursuant to [Section XVI] Note 1(m)." *Id.* at *6 (italics omitted).

## DISCUSSION

### I. Standard of Review

We review the CIT's decision to grant summary judgment de novo, applying the same standard used by the CIT to assess Customs' classification. *See Otter Prods., LLC v. United States*, 834 F.3d 1369, 1374–75 (Fed. Cir. 2016). "Although we review the decision of the CIT de novo, we give great weight to the informed opinion of the CIT and it is nearly always the starting point of our analysis." *Schlumberger Tech. Corp. v. United States*, 845 F.3d 1158, 1162 (Fed. Cir. 2017) (internal quotation marks,

alterations, and citation omitted). The CIT "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT R. 56(a).

The classification of merchandise involves a two-step inquiry. *See LeMans*, 660 F.3d at 1315. First, we ascertain the meaning of the terms within the relevant tariff provision, which is a question of law, and, second, we determine whether the subject merchandise fits within those terms, which is a question of fact. *See Sigma-Tau HealthSci., Inc. v. United States*, 838 F.3d 1272, 1276 (Fed. Cir. 2016). Where, as here, no genuine dispute exists as to the nature of the subject merchandise, the two-step inquiry "collapses into a question of law we review de novo." *LeMans*, 660 F.3d at 1315 (citation omitted).

## II. The CIT Properly Granted Summary Judgment for the Government

### A. Legal Framework

The HTSUS governs the classification of merchandise imported into the United States. *See Wilton Indus., Inc. v. United States*, 741 F.3d 1263, 1266 (Fed. Cir. 2013). The HTSUS "shall be considered . . . statutory provisions of law for all purposes." 19 U.S.C. § 3004(c)(1) (2012); *see Chemtall, Inc. v. United States*, 878 F.3d 1012, 1026 (Fed. Cir. 2017) (explaining that "the tenth-digit statistical suffixes . . . are not statutory," as those suffixes are not incorporated in the HTSUS's legal text).

"The HTSUS scheme is organized by headings, each of which has one or more subheadings; the headings set forth general categories of merchandise, and the subheadings provide a more particularized segregation of the goods within each category." *Wilton Indus.*, 741 F.3d at 1266. "The first four digits of an HTSUS provision constitute the heading, whereas the remaining digits reflect subheadings." *Schlumberger*, 845 F.3d at 1163 n.4. "[T]he

headings and subheadings . . . are enumerated in chapters 1 through 99 of the HTSUS (each of which has its own section and chapter notes) . . . ." *R.T. Foods, Inc. v. United States*, 757 F.3d 1349, 1353 (Fed. Cir. 2014). The HTSUS "also contains the 'General Notes,' the 'General Rules of Interpretation' ('GRI'), the 'Additional [U.S.] Rules of Interpretation' ('ARI'),[3] and various appendices for particular categories of goods." *Id.* (footnote omitted).

The GRI and the ARI govern the classification of goods within the HTSUS. *See Otter Prods.*, 834 F.3d at 1375. "The GRI apply in numerical order, meaning that subsequent rules are inapplicable if a preceding rule provides proper classification." *Schlumberger*, 845 F.3d at 1163. GRI 1 provides, in relevant part, that "classification shall be determined according to the terms of the *headings* and any relative section or chapter notes." GRI 1 (emphasis added). "Under GRI 1, [we] first construe[] the language of the heading, and any section or chapter notes in question, to determine whether the product at issue is classifiable under the heading." *Schlumberger*, 845 F.3d at 1163 (internal quotation marks and citation omitted). "[T]he

---

3      The ARI contain, inter alia, specific rules for interpreting use and textile provisions in the HTSUS. *See* ARI 1(a)–(d). "Because th[is] appeal involves *eo nomine* provisions," as discussed below, "we find the ARI inapplicable." *Schlumberger*, 845 F.3d at 1163 n.5; *see infra* Section II.B. "An *eo nomine* classification provision is one which describes a commodity by a specific name," rather than by use, *Clarendon Mktg., Inc. v. United States*, 144 F.3d 1464, 1467 (Fed. Cir. 1998), and, "[a]bsent limitation or contrary legislative intent, an *eo nomine* provision includes all forms of the named article, even improved forms," *CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1364–65 (Fed. Cir. 2011) (internal quotation marks and brackets omitted).

possible headings are to be evaluated without reference to their subheadings, which cannot be used to expand the scope of their respective headings." *R.T. Foods*, 757 F.3d at 1353 (citations omitted). "Absent contrary legislative intent, HTSUS terms are to be construed according to their common and commercial meanings, which are presumed to be the same." *Well Luck Co. v. United States*, 887 F.3d 1106, 1111 (Fed. Cir. 2018) (internal quotation marks and citation omitted). "To discern the common meaning of a tariff term, we may consult dictionaries, scientific authorities, and other reliable information sources." *Kahrs Int'l, Inc. v. United States*, 713 F.3d 640, 644 (Fed. Cir. 2013) (citation omitted).

"After consulting the headings and relevant section or chapter notes" consistent with GRI 1, we may consider the relevant Explanatory Notes ("EN"). *Fuji Am. Corp. v. United States*, 519 F.3d 1355, 1357 (Fed. Cir. 2008). "The [ENs] provide persuasive guidance and are generally indicative of the proper interpretation, though they do not constitute binding authority." *Chemtall*, 878 F.3d at 1019 (internal quotation marks and citation omitted).

Once we determine the appropriate heading, we apply GRI 6 to determine the appropriate subheading. *See Orlando Food Corp. v. United States*, 140 F.3d 1437, 1442 (Fed. Cir. 1998). GRI 6 provides that "the classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related subheading notes and, *mutatis mutandis*, to the above [GRIs], on the understanding that only subheadings at the same level are comparable."

## B. HTSUS Heading 9013 Covers the Subject Merchandise

ADC argues the subject merchandise is "not accurately described as 'optical appliances' or 'optical instruments'" under HTSUS Heading 9013. Appellant's Br. 19 (capitalization modified). According to ADC, "[a]lthough [the VAMs] act on or interact with light, as apparatus used

exclusively for the transmission of data through a fiber optic telecommunications network[,] these items transmit light *solely* in the infrared" and thus are not classifiable under HTSUS Heading 9013, as they "cannot permit or enhance human vision[,] because the optical output of these items can never be seen by humans during normal operation." *Id.* at 22 (internal quotation marks omitted). We disagree.

"We first must assess whether the subject [h]eading[] constitute[s an] *eo nomine* or use provision[] because different rules and analysis will apply depending upon the heading type." *Schlumberger*, 845 F.3d at 1164 (first citing *Kahrs*, 713 F.3d at 645–46 (defining *eo nomine* provision); then citing *Aromont USA, Inc. v. United States*, 671 F.3d 1310, 1312–16 (Fed. Cir. 2012) (defining principal use provision)). HTSUS Heading 9013 recites "[l]iquid crystal devices not constituting articles provided for more specifically in other headings; lasers, other than laser diodes; *other optical appliances and instruments*, not specified or included elsewhere in this chapter; parts and accessories thereof." HTSUS Heading 9013 (emphasis added). It "is unquestionably *eo nomine* because it describes the articles it covers by name," and, therefore, "our analysis starts with [its] terms." *Schlumberger*, 845 F.3d at 1164.

We start with the language of the heading, looking to the relevant section and chapter notes. *See id.* at 1163; *see also* GRI 1. Additional U.S. Note 3 to Chapter 90 explains that "the terms 'optical appliances' and 'optical instruments' refer only to those appliances and instruments which incorporate *one or more optical elements*, but do not include any appliances or instruments in which the incorporated optical element or elements are solely for viewing a scale or *for some other subsidiary purpose*." Additional U.S. Note 3, Chapter 90, HTSUS (emphases added). In other words, for the subject merchandise to fall within HTSUS Heading 9013's definition of optical appliances or instruments, it must (1) incorporate one or more optical

elements and (2) the optical element cannot merely serve a subsidiary purpose.

Because the relevant section and chapter notes do not further define the terms "optical appliances" or "optical instruments," we turn to the common and commercial meaning of the statutory terms. *See Well Luck*, 887 F.3d at 1113 n.6 (employing dictionary definitions from the time of the HTSUS's enactment). A technical dictionary defines "optical instrument" as "[a]n optical system which *acts on light* in some desired way, such as to form a real or virtual image, to form an optical spectrum, or to produce light with a specified polarization or wavelength." *Optical Instrument*, McGraw-Hill Dictionary of Scientific and Technical Terms (4th ed. 1989) (emphasis added). Moreover, the same technical dictionary defines the term "optical element," which appears in Additional U.S. Note 3 to Chapter 90 of the HTSUS to delimit optical appliances and optical instruments, as "[a] part of an optical instrument which *acts upon the light* passing through the instrument, such as a lens, prism, or mirror." *Optical Element*, McGraw-Hill Dictionary of Scientific and Technical Terms (4th ed. 1989) (emphasis added).

Non-technical dictionaries define the individual term "optical" as "[o]f or pertaining to sight in relation to the physical action of light upon the eye," "belonging to optics," and "[u]sed with reference *to electromagnetic radiation other than light . . .* relating to the transmission of such radiation." *Optical*, The Oxford English Dictionary (2d ed. 1989) (emphasis added); *see Optical*, Webster's Third New International Dictionary (1986) (defining "optical" as (1) "relating to the science of optics," (2) "designed or constructed to aid the vision," and (3) "acting by means of light or in accord with the principles of optics"). These dictionaries, in turn, define "optics" as "a science that deals with light, its genesis and propagation, the effects that it undergoes and produces, and other phenomena closely associated with it." *Optics*, Webster's Third New International

Dictionary (1986); *see Optics*, The Oxford English Dictionary (2d ed. 1989) (defining "optics" as "[t]he science of sight, or the medium of sight, i.e. light; that branch of physics which deals with the properties and phenomena of light"). Based on the relevant chapter note and dictionary definitions, HTSUS Heading 9013 covers appliances and instruments that act on light, including (but not limited to) visible light.

These definitions accord with precedent. In *United States v. Ataka America, Inc.*, the U.S. Court of Customs and Patent Appeals ("CCPA") articulated criteria ("the *Ataka* criteria") used for determining whether certain gastrointestinal fiberscopes were classifiable as optical instruments under the HTSUS's predecessor. 550 F.2d 33, 37–38 (CCPA 1977). In *Celestaire, Inc. v. United States* (*Celestaire II*), we determined that an imported sextant was an optical instrument under HTSUS Subheading 9014.80.10 through application of the *Ataka* criteria, which ask: (1) "whether the device acts on or interacts with light," (2) "whether the device permits or enhances human vision through the use of one or more optical elements," and (3) "whether the device uses the optical properties of the device in something more than a 'subsidiary' capacity." 120 F.3d 1232, 1233 (Fed. Cir. 1997) (citation omitted); *see id.* at 1232. The *Ataka* court made explicit that "[n]one of the foregoing criteria is determinative in every case, but they are useful in determining the statutory meaning of optical instrument(s)," 550 F.2d at 37 (internal quotation marks omitted), thereby acknowledging that the *Ataka* criteria provide *factors* to be considered in such an analysis, *see id.* (explaining "the term optical instrument(s) *encompasses* devices" that satisfy the criteria listed above, rather than is limited to such devices (emphasis added)). Thus, if the device permits or enhances human vision, that is a strong indicator that it would be classified as an "optical instrument" or "optical appliance." The absence of such capabilities, however, does not preclude finding that a particular

device, which otherwise satisfies the remaining criteria, is an "optical instrument." *See id.*; *see also Celestaire II*, 120 F.3d at 1233 (referring to the three factors described in *Ataka* as "criteria" rather than elements).

The origin test for "optical instruments" arose from the Summary of Tariff Information, which was issued by the U.S. Tariff Commission and states:

> Optical instruments are *primarily used* to aid or supplement human vision; *they also include* apparatus which depends for its operation on the passage of light through prismatic or lenticular optical glass. Lenses and prisms are the fundamental parts of optical instruments.

Summary of Tariff Information, 552 (1929) (emphases added); *see Engis Equip. Co. v. United States*, 294 F. Supp. 964, 967 (Cust. Ct. 1969), *superseded by statute as recognized in Celestaire v. United States* (*Celestaire I*), 928 F. Supp. 1174, 1175 (Ct. Int'l Trade 1996).[4] On its face, this indicates that optical instruments typically aid or supplement human vision, but a device that does not have such capabilities may still be classified as an optical instrument, e.g., "glass eyes for taxidermists." Summary of Tariff Information at 553. This was recognized by the CCPA as

---

[4] The 1929 Summary of Tariff Information, which was published in volumes, "is a comprehensive summary of available tariff information" and "compiled by the [U.S.] Tariff Commission for the use of the Committee on Ways and Means [of the U.S. House of Representatives], in connection with an examination of the Tariff Act of 1922, for the purpose of making any readjustments in said act where found necessary." *Foreword* to Summary of Tariff Information at iii. "Each summary contains descriptive and economic data on the commodities or group of commodities provided for in the Tariff Act of 1922 . . . ." *Id.*

early as 1941, where it interpreted the term "[o]ptical instruments" in a predecessor to the HTSUS as having "to do with *light or vision, or both.*" *United States v. Am. Mach. & Metals*, 29 C.C.P.A. 137, 145 (1941) (emphasis added).

Our holding that satisfying each of the *Ataka* criteria is not required does not mean that importers will lack necessary certainty. *See Jarvis Clark Co. v. United States*, 733 F.2d 873, 876 (Fed. Cir. 1984) ("The desire for uniform and consistent interpretation and application of the customs law is central to customs policy." (internal quotation marks and citation omitted)). We acknowledge that several headings and subheadings throughout the HTSUS use the terms "optical appliances" or "optical instruments," such that the determination of which *Ataka* criteria are the most relevant may depend on, inter alia, the statutory context. However, for classification within Chapter 90, the consideration of the *Ataka* criteria must accord with Additional U.S. Note 3, which is binding and requires only that optical appliances and instruments "incorporate one or more optical elements" in a non-subsidiary capacity. Additional U.S. Note 3, Chapter 90, HTSUS; *see Schlumberger*, 845 F.3d at 1163 (requiring courts to consider any relevant chapter notes under GRI 1).[5]

Here, ADC's subject merchandise falls within HTSUS Heading 9013's definition of optical appliances or instruments. The subject merchandise acts by means of light, given that the splitter modules, monitor modules, and WDM modules all seek to "ease installation" of the modules into ADC's "telecommunications network operator customers' fiber optic networks," such that the networks operate through "*pulses of light in the infrared wavelength range*"

---

[5]    While we may now turn to the relevant ENs, *see Fuji*, 519 F.3d at 1357, we have considered them and conclude that there are no ENs that would alter our interpretation of HTSUS Heading 9013.

to transmit voice and other data. *ADC*, 2017 WL 4708021, at *2 (emphasis added) (citations omitted). Although the fiber optic networks employ a wavelength range of "approximately 1260 nanometers to 1650 nanometers," i.e., not within the range of visible light, *id.* (citations omitted), it is clear that the subject merchandise employs optical elements, *see, e.g.*, J.A. 1057 (explaining that the WDM modules employ "*lenses*, planar lightwave circuits, fused biconic tapers[,] or thin film filters" (emphasis added)); *see also* Additional U.S. Note 3, Chapter 90, HTSUS (explaining that an optical appliance or instrument contains "one or more optical elements"); *Optical Element*, McGraw-Hill Dictionary of Scientific and Technical Terms (4th ed. 1989) (defining an optical element as "[a] part of an optical instrument which acts upon the light passing through the instrument, such as a *lens*, prism, or mirror" (emphasis added)). These optical elements are not subsidiary to another purpose; instead, the subject merchandise "is used *primarily* or exclusively for purposes of data transmission in a telecommunications network . . . *exclusively using light* in the infrared wavelength range." *ADC*, 2017 WL 4708021, at *3 (emphases added) (citations omitted). Accordingly, the subject merchandise is classifiable under HTSUS Heading 9013.

ADC's counterarguments fail. First, ADC contends the subject merchandise should be classified under Chapter 85, which contains HTSUS Heading 8517, rather than Chapter 90, which contains HTSUS Heading 9013, because other headings in these respective chapters support finding a difference between types of fiber optic cables classifiable in Chapter 85 versus those in Chapter 90. *See* Appellant's Br. 30–31. According to ADC, "[H]eading 9001 by its very own terms only covers 'optical fiber cables *other* than those of [H]eading 8544,'" and Heading 8544 covers fiber optic cables *primarily used* for transmission of voice and other data. *Id.* at 31. However, the distinction between HTSUS Headings 8544 and 9001 is not based on the use of the

optical fibers, and is instead based on the fibers' physical characteristics. Specifically, HTSUS Heading 8544 includes "optical fiber cables, made up of *individually sheathed fibers*, whether or not assembled with electric conductors or fitted with connectors," Heading 8544, HTSUS (emphasis added), whereas the ENs explain that the cables covered by HTSUS Heading 9001 "consist of a sheath containing one or more optical fibre bundles, the fibres of which are *not individually sheathed*," EN(A), HTSUS Heading 9001 (emphasis added); *see* Customs Ruling HQ H098958 (Sept. 27, 2017), 2017 WL 5696486, at \*6 ("[T]he determining factor in the classification of optical fiber cables or bundles in [H]eading 8544 or [H]eading 9001 is the physical characteristics of the article; their use is secondary . . . . [The ENs to these headings do not] limit[] the use of these products exclusively to telecommunications for cables of [H]eading 8544 or optical apparatus for products of [H]eading 9001."). Moreover, certain ENs contradict ADC's alleged distinction between Chapters 85 and 90 because the optical appliances and instruments within Chapter 90 are not strictly limited to those acting on visible light. For example, the ENs to HTSUS Heading 9001 state that "[a]n optical element does more than merely allow light (visible, *ultraviolet or infrared*) to pass through it." EN(D), Heading 9001 (emphasis added). Similarly, the EN to HTSUS Subheading 9031.49 explains that "[t]his [S]ubheading covers not only instruments and appliances which provide a direct aid or enhancement to human vision, but also other instruments and apparatus which function through the use of optical elements or processes." EN, Subheading 9031.49. Therefore, the subject merchandise is not excluded from Chapter 90.

Second, ADC argues "[m]ore than [fifty] years of customs jurisprudence concerning the tariff classification of optical instruments . . . firmly establishes that such articles must 'permit or enhance human vision.'" Appellant's Br. 36. To support this conclusion, ADC cites, inter alia,

our decision in *Celestaire II*. *See id.* at 21–26.[6] For the reasons discussed above, *Celestaire II* does not support ADC's conclusion because we merely applied the *Ataka* criteria in that case to determine whether a device was an optical instrument. 120 F.3d at 1233. As has long been recognized, these criteria "are neither controlling nor exhaustive." *Celestaire I*, 928 F. Supp. at 1180 (internal quotation marks omitted); *see Ataka*, 550 F.2d at 37 (explaining that "[n]one of the . . . criteria is determinative in every case"). Instead, "it is the statute . . . which governs the classification of an article as an optical instrument." *Celestaire I*, 928 F. Supp. at 1179 (quoting *Ataka*, 550 F.2d at 36 n.4). We, therefore, conclude that HTSUS Heading 9013 aptly covers the subject merchandise.

## C. The Subject Merchandise Does Not Fall Within HTSUS Heading 8517

ADC argues "the splitter modules, monitor modules[,] and [WDM] modules at issue in this case fall squarely within the terms of [H]eading 8517." Appellant's Br. 44. We disagree.

We start with the language of the heading, looking to the relevant section and chapter notes. *See Schlumberger*, 845 F.3d at 1163; *see also* GRI 1. HTSUS Heading 8517 covers "[t]elephone sets, including telephones for cellular networks or for other wireless networks" and "other apparatus for the transmission or reception of voice, images or other data, including apparatus for communication in a wired or wireless network (such as a local or wide area network), other than transmission or reception apparatus of [H]eading 8443, 8525, 8527, or 8528; parts thereof." Chapter 85 of the HTSUS is contained in Section XVI, and Note

---

6    To the extent that ADC's argument also relies on CIT cases, *see* Appellant's Br. 35, the CIT cases are not binding precedent.

1 to Section XVI provides that "[t]his section does not cover . . . (m) [a]rticles of [C]hapter 90." Therefore, because the subject merchandise is classifiable in HTSUS Heading 9013, which is found in Chapter 90, *see supra* Section II.B, it is *not* classifiable in Section XVI, in which HTSUS Heading 8517 is found.

D. GRI 6 Dictates that the Subject Merchandise Is Properly Classified Under HTSUS Subheading 9013.80.90

Having determined that the subject merchandise is properly classified under HTSUS Heading 9013, we apply GRI 6, which is employed in a classification analysis to determine the appropriate subheading. *See* GRI 6 (applying to "the classification of goods in the subheadings" and explaining that "only subheadings at the same level are comparable"); *see also Orlando Food*, 140 F.3d at 1442 (conducting a GRI 6 analysis to determine the appropriate subheading). At the six-digit subheading level, the subject merchandise does not fall within the terms of HTSUS Subheading 9013.10, which covers "[t]elescopic sights for fitting to arms; periscopes; telescopes designed to form parts of machines, appliances, instruments or apparatus of this [C]hapter or [S]ection XVI," or HTSUS Subheading 9013.20, which covers "[l]asers, other than laser diodes." Instead, the subject merchandise is aptly described by HTSUS Subheading 9013.80, which covers "[o]ther devices, appliances and instruments." Because the subject merchandise does not fall within any of the eight-digit level subheadings preceding HTSUS Subheading 9013.80.90, it is properly classified under HTSUS Subheading 9013.80.90, which covers "[o]ther." *See Rollerblade, Inc. v. United States*, 282 F.3d 1349, 1354 (Fed. Cir. 2002) (holding that, where merchandise is properly classified under a particular heading, but does not fall within a specific subheading, it is properly classified under the relevant heading's "basket" or "catch-all" provision); *see also* Oral Arg. at 2:15–31, http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2018-1316.mp3 (Q: "If we determine that

[Heading] 9013 covers the subject merchandise, would you agree that 9013.80.90 is the appropriate Subheading?" A: "Yes, I would agree that that would be the outcome."). Indeed, the parties do not contest the CIT's conclusion that, if the subject merchandise is properly classified under HTSUS Heading 9013, then it falls within HTSUS Subheading 9013.80.90. *See ADC*, 2017 WL 4708021, at \*9. *See generally* Appellant's Br.; Appellee's Br. Accordingly, we conclude that HTSUS Subheading 9013.80.90 is the appropriate classification for the subject merchandise.

CONCLUSION

We have considered ADC's remaining arguments and find them unpersuasive. Accordingly, the Judgment of the U.S. Court of International Trade is

**AFFIRMED**